[No. S100809. Nov. 25, 2002.]

MATTHEW PAVLOVICH, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
DVD COPY CONTROL ASSOCIATION, INC., Real Party in Interest.

## COUNSEL

Ornah Levy; Huber Samuelson; HS Law Group; Hopkins & Carley, Arthur V. Plank and Allonn E. Levy for Petitioner.

Richard S. Wiebe for the Computer & Communications Industry Association and the Student Press Law Center as Amici Curiae on behalf of Petitioner.

Ann Brick and Stephen McG. Bundy for the American Civil Liberties Union of Northern California as Amicus Curiae on behalf of Petitioner.

Weil, Gotshal & Manges, Jared Ben Bobrow, Christopher J. Cox, Robert G. Sugarman, Jeffrey L. Kessler, Geoffrey D. Berman and Gregory S. Coleman for Real Party in Interest.

## OPINION

**BROWN, J.**—"The Internet is an international network of interconnected computers" which "enable[s] tens of millions of people to communicate with one another and to access vast amounts of information from around the world." (*Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 849-850 [117 S.Ct. 2329, 2334, 138 L.Ed.2d 874].) "The best known category of communication over the Internet is the World Wide Web, which allows users to search for and retrieve information stored in remote computers, as well as, in some cases, to communicate back to designated sites. In concrete terms, the Web consists of a vast number of documents stored in different computers all over the world." (*Id.* at p. 852 [117 S.Ct. at p. 2335].) On the Web, "documents, commonly known as Web 'pages,' are . . . prevalent." (*Ibid.*) These pages are located at Web sites and have addresses marking their location on the Web. (See *ibid.*) If a Web page is freely accessible, then anyone with access to a computer connected to the Internet may view that page. With its explosive growth over the past two decades, the Internet has become " 'a unique and wholly new medium of worldwide human communication.' " (*Id.* at p. 850 [117 S.Ct. at p. 2334].)

Not surprisingly, the so-called Internet revolution has spawned a host of new legal issues as courts have struggled to apply traditional legal frameworks to this new communication medium. Today, we join this struggle and consider the impact of the Internet on the determination of personal jurisdiction. In this case, a California court exercised personal jurisdiction over a defendant based on a posting on an Internet Web site. Under the particular facts of this case, we conclude the court's exercise of jurisdiction was improper.

I

Digital versatile discs (DVD's) "provide high quality images, such as motion pictures, digitally formatted on a convenient 5-inch disc . . . ." Before the commercial release of DVD's containing motion pictures, the Content Scrambling System (CSS), a system used to encrypt and protect copyrighted motion pictures on DVD's, was developed. The CSS technology prevents the playing or copying of copyrighted motion pictures on DVD's without the algorithms and keys necessary to decrypt the data stored on the disc.

Real party in interest DVD Copy Control Association, Inc. (DVD CCA) is a nonprofit trade association organized under the laws of the State of Delaware with its principal place of business in California. The DVD industry created DVD CCA in December 1998 to control and administer licensing of the CSS technology. In September 1999, DVD CCA hired its staff, and, in December 1999, it began administering the licenses. Soon thereafter, DVD CCA acquired the licensing rights to the CSS technology and became the sole licensing entity for this technology in the DVD video format.

Petitioner Matthew Pavlovich is currently a resident of Texas and the president of Media Driver, LLC, a technology consulting company in Texas. During the four years before he moved to Texas, he studied computer engineering at Purdue University in Indiana, where he worked as a systems and network administrator. Pavlovich does not reside or work in California. He has never had a place of business, telephone listing, or bank account in California and has never owned property in California. Neither Pavlovich nor his company has solicited any business in California or has any business contacts in California.

At Purdue, Pavlovich was the founder and project leader of the LiVid video project (LiVid), which operated a Web site located at "livid.on.open-projects.net." The site consisted of a single page with text and links to other

Web sites. The site only provided information; it did not solicit or transact any business and permitted no interactive exchange of information between its operators and visitors.

According to Pavlovich, the goal of LiVid was "to improve video and DVD support for Linux and to . . . combine the resources and the efforts of the various individuals that were working on related things . . . ." To reach this goal, the project sought to defeat the CSS technology and enable the decryption and copying of DVD's containing motion pictures. Consistent with these efforts, LiVid posted the source code of a program named DeCSS on its Web site as early as October 1999. DeCSS allows users to circumvent the CSS technology by decrypting data contained on DVD's and enabling the placement of this decrypted data onto computer hard drives or other storage media.

At the time LiVid posted DeCSS, Pavlovich knew that DeCSS "was derived from CSS algorithms" and that reverse engineering these algorithms was probably illegal. He had also "heard" that "there was an organization which you had to file for or apply for a license" to the CSS technology. He did not, however, learn that the organization was DVD CCA or that DVD CCA had its principal place of business in California until after DVD CCA filed this action.

In its complaint, DVD CCA alleged that Pavlovich misappropriated its trade secrets by posting the DeCSS program on the LiVid Web site because the "DeCSS program . . . embodies, uses, and/or is a substantial derivation of confidential proprietary information which DVD CCA licenses . . . ." The complaint sought injunctive relief but did not seek monetary damages. In response, Pavlovich filed a motion to quash service of process, contending that California lacked jurisdiction over his person. DVD CCA opposed, contending that jurisdiction was proper because Pavlovich "misappropriated DVD CCA's trade secrets knowing that such actions would adversely impact an array of substantial California business enterprises— including the motion picture industry, the consumer electronics industry, and the computer industry." In a brief order, the trial court denied Pavlovich's motion, citing *Calder v. Jones* (1984) 465 U.S. 783 [104 S.Ct. 1482, 79 L.Ed.2d 804] (*Calder*), and *Panavision Intern., L.P. v. Toeppen* (9th Cir. 1998) 141 F.3d 1316 (*Panavision*).

Pavlovich petitioned the Court of Appeal for a writ of mandate. After the Court of Appeal summarily denied the petition, we granted review and transferred the matter back to the Court of Appeal with directions to vacate its denial order and issue an order to show cause. The Court of Appeal then

issued a published opinion denying the petition. Because Pavlovich knew that posting DeCSS on the LiVid Web site would harm the movie and computer industries in California and because "the reach of the Internet is also the reach of the extension of the poster's presence," the court found that he purposefully availed himself of forum benefits under the *Calder* effects test. The court also concluded that the exercise of jurisdiction over Pavlovich was reasonable.

We granted review to determine whether the trial court properly exercised jurisdiction over Pavlovich's person based solely on the posting of the DeCSS source code on the LiVid Web site. We conclude it did not.

## II

■ California courts may exercise personal jurisdiction on any basis consistent with the Constitutions of California and the United States. (Code Civ. Proc., § 410.10.) The exercise of jurisdiction over a nonresident defendant comports with these Constitutions "if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (*Vons*), quoting *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 [66 S.Ct. 154, 158, 90 L.Ed. 95, 161 A.L.R. 1057] (*Internat. Shoe*).)

Under the minimum contacts test, "an essential criterion in all cases is whether the 'quality and nature' of the defendant's activity is such that it is 'reasonable' and 'fair' to require him to conduct his defense in that State." (*Kulko v. California Superior Court* (1978) 436 U.S. 84, 92 [98 S.Ct. 1690, 1697, 56 L.Ed.2d 132], quoting *Internat. Shoe, supra*, 326 U.S. at pp. 316-317, 319 [66 S.Ct. at pp. 158, 159-160].) "[T]he 'minimum contacts' test . . . is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present." (*Kulko*, at p. 92 [98 S.Ct. at p. 1697], quoting *Hanson v. Denckla* (1958) 357 U.S. 235, 246 [78 S.Ct. 1228, 1235, 2 L.Ed.2d 1283] (*Hanson*).) "[T]his determination is one in which few answers will be written 'in black and white. The greys are dominant and even among them the shades are innumerable.' " (*Kulko*, at p. 92 [98 S.Ct. at p. 1697], quoting *Estin v. Estin* (1948) 334 U.S. 541, 545 [68 S.Ct. 1213, 1216, 92 L.Ed. 1561, 1 A.L.R.2d 1412].)

■ In making this determination, courts have identified two ways to establish personal jurisdiction. "Personal jurisdiction may be either general

or specific." (*Vons, supra,* 14 Cal.4th at p. 445.) In this case, DVD CCA does not contend that general jurisdiction exists. We therefore need only consider whether specific jurisdiction exists.

When determining whether specific jurisdiction exists, courts consider the " 'relationship among the defendant, the forum, and the litigation.' " (*Helicopteros Nacionales de Colombia v. Hall* (1984) 466 U.S. 408, 414 [104 S.Ct. 1868, 1872, 80 L.Ed.2d 404], quoting *Shaffer v. Heitner* (1977) 433 U.S. 186, 204 [97 S.Ct. 2569, 2579, 53 L.Ed.2d 683].) A court may exercise specific jurisdiction over a nonresident defendant only if: (1) "the defendant has purposefully availed himself or herself of forum benefits" (*Vons, supra,* 14 Cal.4th at p. 446); (2) "the 'controversy is related to or "arises out of" [the] defendant's contacts with the forum' " (*ibid.,* quoting *Helicopteros, supra,* 466 U.S. at p. 414 [104 S.Ct. at p. 1872]); and (3) " 'the assertion of personal jurisdiction would comport with "fair play and substantial justice" ' " (*Vons, supra,* 14 Cal.4th at p. 447, quoting *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 472-473 [105 S.Ct. 2174, 2182, 85 L.Ed.2d 528] (*Burger King*)).

"The purposeful availment inquiry . . . focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on" his contacts with the forum. (*U.S. v. Swiss American Bank, Ltd.* (1st Cir. 2001) 274 F.3d 610, 623-624 (*Swiss American Bank*).) Thus, the " 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts [citations], or of the 'unilateral activity of another party or a third person.' [Citations.]" (*Burger King, supra,* 471 U.S. at p. 475 [105 S.Ct. at p. 2183].) "When a [defendant] 'purposefully avails itself of the privilege of conducting activities within the forum State,' [citation], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 [100 S.Ct. 559, 567, 62 L.Ed.2d 490] (*World-Wide Volkswagen*).)

In the defamation context, the United States Supreme Court has described an "effects test" for determining purposeful availment. (*Noonan v. Winston Co.* (1st Cir. 1998) 135 F.3d 85, 90 (*Noonan*).) In *Calder,* a reporter in Florida wrote an article for the National Enquirer about Shirley Jones, a well-known actress who lived and worked in California. The president and

editor of the National Enquirer reviewed and approved the article, and the National Enquirer published the article. Jones sued, among others, the reporter and editor (individual defendants) for libel in California. The individual defendants moved to quash service of process, contending they lacked minimum contacts with California. (*Calder, supra*, 465 U.S. at pp. 785-786 [104 S.Ct. at pp. 1484-1485].)

The United States Supreme Court disagreed and held that California could exercise jurisdiction over the individual defendants "based on the 'effects' of their Florida conduct in California." (*Calder, supra*, 465 U.S. at p. 789 [104 S.Ct. at p. 1487].) The court found jurisdiction proper because "California [was] the focal point both of the story and of the harm suffered." (*Ibid.*) "The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California . . . and the brunt of the harm, in terms both of [Jones's] emotional distress and the injury to her professional reputation, was suffered in California." (*Id.* at pp. 788-789 [104 S.Ct. at p. 1486], fn. omitted.) The court also noted that the individual defendants wrote or edited "an article that they knew would have a potentially devastating impact upon [Jones]. And they knew that the brunt of that injury would be felt by [Jones] in the State in which she lives and works and in which the National Enquirer has its largest circulation." (*Id.* at pp. 789-790 [104 S.Ct. at p. 1487].)

Although *Calder* involved a libel claim, courts have applied the effects test to other intentional torts, including business torts. (See *IMO Industries, Inc. v. Kiekert AG* (3d Cir. 1998) 155 F.3d 254, 259-260, 261 (*IMO*) [courts must consider *Calder* in intentional tort cases]; *Far West Capital, Inc. v. Towne* (10th Cir. 1995) 46 F.3d 1071, 1077 (*Far West*) ["Courts have also applied *Calder* to business torts"].) Application of the test has, however, been less than uniform. (See *Swiss American Bank, supra*, 274 F.3d at p. 624, fn. 7 ["we note that several circuits do not appear to agree as to how to read *Calder*"]; *IMO, supra*, 155 F.3d at p. 261 [courts applying *Calder* to non-defamation cases have adopted "a mixture of broad and narrow interpretations"].) Indeed, courts have "struggled somewhat with *Calder*'s import, recognizing that the case cannot stand for the broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific jurisdiction." (*Bancroft & Masters, Inc. v. Augusta Nat. Inc.* (9th Cir. 2000) 223 F.3d 1082, 1087 (*Bancroft*).)

Despite this struggle, most courts agree that merely asserting that a defendant knew or should have known that his intentional acts would cause harm in the forum state is not enough to establish jurisdiction under the

effects test. (See *IMO, supra,* 155 F.3d at p. 265 ["we . . . agree with the conclusion reached by the First, Fourth, Fifth, Eighth, Ninth and Tenth Circuits that jurisdiction under *Calder* requires more than a finding that the harm caused by the defendant's intentional tort is primarily felt within the forum"]; *Griffis v. Luban* (Minn. 2002) 646 N.W.2d 527, 534 [the United States Supreme Court "did make it clear that foreseeability of effects in the forum is not itself enough to justify long-arm jurisdiction"].) Instead, the plaintiff must also "point to contacts which demonstrate that the defendant *expressly aimed* its tortious conduct at the forum . . . ." (*IMO, supra,* 155 F.3d at p. 265.) For example, the Third Circuit Court of Appeals has held that, to meet the effects test, "the plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." (*IMO, supra,* 155 F.3d at p. 266.) Similarly, in the Ninth Circuit Court of Appeals, the plaintiff must show not only that the defendant "caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state," but also that the defendant "committed an intentional act . . . expressly aimed at the forum state." (*Bancroft, supra,* 223 F.3d at p. 1087.) Indeed, virtually every jurisdiction has held that the *Calder* effects test requires intentional conduct *expressly aimed at or targeting* the forum state in addition to the defendant's knowledge that his intentional conduct would cause harm in the forum.[1]

---

[1](See, e.g., *Wien Air Alaska, Inc. v. Brandt* (5th Cir. 1999) 195 F.3d 208, 212 ["Foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum"]; *Noonan, supra,* 135 F.3d at p. 91 [holding that the defendants' knowledge that the plaintiff would suffer injury in the forum was insufficient to establish jurisdiction under the effects test because the defendants "did not direct their actions toward" the forum state]; *id.* at pp. 90-91; *ESAB Group, Inc. v. Centricut, Inc.* (4th Cir. 1997) 126 F.3d 617, 625 (*ESAB*) [holding that the defendants' knowledge that their actions would, if successful, "result in less sales" for the plaintiff, "which was headquartered in" the forum state, was insufficient to establish jurisdiction under the effects test, because the defendants did not "manifest behavior intentionally targeted at and focused on" the forum]; *Far West, supra,* 46 F.3d at p. 1080 [holding that the defendants' knowledge that their acts would interfere with the contractual rights of a forum resident is not enough to establish jurisdiction under the effects test because their acts had no "connection" to the forum state "beyond [the] plaintiff's corporate domicile"]; *id.* at pp. 1079-1080; *Hicklin Engineering, Inc. v. Aidco, Inc.* (8th Cir. 1992) 959 F.2d 738, 739 [holding that the defendant's knowledge that its tortious acts "may have an effect on a competitor, absent additional contacts," is insufficient to establish jurisdiction]; *Drayton Enterprises, L.L.C. v. Dunker* (D.N.D. 2001) 142 F.Supp.2d 1177, 1184 [holding that the defendants' "revealing and procuring [of] a trade secret" "while knowing that the primary consequence would be felt in" the forum state was not enough to establish jurisdiction]; *id.* at pp. 1184-1185; *Cognigen Networks, Inc. v. Cognigen Corp.* (W.D.Wash. 2001) 174 F.Supp.2d 1134, 1141 ["A defendant's knowledge of a resident plaintiff's use of a mark in an intellectual property tort claim is not enough to satisfy the effects test for personal jurisdiction"]; *Barrett v. Catacombs Press* (E.D.Pa. 1999) 44

At least one exception does, however, exist. In *Janmark, Inc. v. Reidy* (7th Cir. 1997) 132 F.3d 1200, the plaintiff, an Illinois corporation, and the defendants, California residents, were competitors who sold minishopping carts worldwide. The defendants claimed that they owned a copyright in their cart design and threatened the plaintiff's New Jersey customer with contributory copyright infringement. Because of the threat, the customer stopped buying shopping carts from the plaintiff. Based on this incident, the plaintiff sued the defendants for tortious interference with prospective economic advantage. (*Id.* at p. 1201.) Although the defendants had no other contacts with Illinois, the Seventh Circuit Court of Appeals found that Illinois could exercise jurisdiction over the defendants *solely* because "the injury and thus the tort occurred in Illinois." (*Id.* at p. 1202.) In doing so, the Seventh Circuit apparently concluded that the state where the injury occurred—in this case, the plaintiff's residence—could always exercise jurisdiction over a nonresident defendant in the intentional tort context.

Like most of our sister courts, we do not find *Janmark* persuasive. By making the location of the harm dispositive, *Janmark* ignores "the defendant's knowledge and intent in committing the tortious activity"—the very focus of the purposeful availment requirement. (*IMO, supra,* 155 F.3d at p. 264.) Even if *Janmark* merely stands for the proposition that a defendant's knowledge that its tortious acts would cause the plaintiff injury in the forum state satisfies the effects test (see *IMO, supra,* 155 F.3d at p. 264, fn. 6), it is still problematic. ■ "[F]oreseeability of causing *injury* in another State . . . is not a 'sufficient benchmark' for exercising personal jurisdiction." (*Burger King, supra,* 471 U.S. at p. 474 [105 S.Ct. at p. 2183].) Rather, "the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." (*World-Wide Volkswagen, supra,* 444 U.S. at p. 297 [100 S.Ct. at p. 567].) The knowledge that harm will likely be suffered in the forum state, "when unaccompanied by other contacts," is therefore "too unfocused to justify personal jurisdiction." (*ESAB, supra,* 126 F.3d at p. 625.) Thus, we decline to follow *Janmark*

F.Supp.2d 717, 731 ["Unless [the forum state] is deliberately or knowingly targeted by the tortfeasor, the fact that harm is felt in [the forum state] from conduct occurring outside [that state] is never sufficient to satisfy due process"]; *Conseco, Inc. v. Hickerson* (Ind.Ct.App. 1998) 698 N.E.2d 816, 819 [holding that the defendant's knowing posting of a forum resident's trademark on a Web site was insufficient to confer jurisdiction because there was no "purposefully directed activity"]; *Griffis v. Luban, supra,* 646 N.W.2d at pp. 535-537 [holding that the knowing posting of defamatory material about a forum resident on the Internet is insufficient to establish express aiming]; *Laykin v. McFall* (Tex.App. 1992) 830 S.W.2d 266, 271 [holding that a court may not exercise jurisdiction even though the "intentional tortfeasor knowingly cause[d] injury" in the forum state because "he did not purposefully direct his activities into" the forum].)

and its progeny[2] and join with those jurisdictions that require additional evidence of express aiming or intentional targeting. In doing so, we are in accord with those California decisions applying the effects test.[3]

■ We now consider whether Pavlovich's contacts with California meet the effects test. ■ "[T]he plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction." (*Vons, supra,* 14 Cal.4th at p. 449.) If the plaintiff meets this initial burden, then the defendant has the burden of demonstrating "that the exercise of jurisdiction would be unreasonable." (*Ibid.*) In reviewing a trial court's determination of jurisdiction, we will not disturb the court's factual determinations "if supported by substantial evidence." (*Ibid.*) "When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record." (*Ibid.*) ■ Applying these standards, we conclude that the evidence in the record fails to show that Pavlovich expressly aimed his tortious conduct at or intentionally targeted California.

In this case, Pavlovich's sole contact with California is LiVid's posting of the DeCSS source code containing DVD CCA's proprietary information on an Internet Web site accessible to any person with Internet access. Pavlovich never worked in California. He owned no property in California, maintained no bank accounts in California, and had no telephone listings in California. Neither Pavlovich nor his company solicited or transacted any business in

---

[2](See, e.g., *Bunn-O-Matic Corp. v. Bunn Coffee Service Inc.* (C.D.Ill. 2000) 88 F.Supp.2d 914; *Clearclad Coatings, Inc. v. Xontal Ltd.* (N.D.Ill. Aug. 20, 1999, No. 98 C 7199) 1999 WL 652030; *McMaster-Carr Supply Co. v. Supply Depot, Inc.* (N.D.Ill. June 16, 1999, No. 98 C 1903) 1999 WL 417352; *Bunn-O-Matic Corp. v. Bunn Coffee Service Inc.* (C.D.Ill. 1998) 46 U.S.P.Q.2d 1375 (*Bunn-O-Matic I*).)

[3](See, e.g., *Sibley v. Superior Court* (1976) 16 Cal.3d 442, 446 [128 Cal.Rptr. 34, 546 P.2d 322] ["The mere causing of an 'effect' in California . . . is not necessarily sufficient to afford a constitutional basis for jurisdiction"]; *Mansour v. Superior Court* (1995) 38 Cal.App.4th 1750, 1762 [46 Cal.Rptr.2d 191] [refusing to exercise jurisdiction under the effects test because there was "no evidence [the defendants] purposefully directed their activities toward[] California"]; *Edmunds v. Superior Court* (1994) 24 Cal.App.4th 221, 236 [29 Cal.Rptr.2d 281] [refusing to exercise jurisdiction under the effects test because the defendant's acts were directed at Hawaii and not California]; *Wolfe v. City of Alexandria* (1990) 217 Cal.App.3d 541, 548-549 [265 Cal.Rptr. 881] (*Wolfe*) [refusing to exercise jurisdiction under the effects test because the defendant's acts, even if wrongful and fraudulent, were not expressly aimed at California]; *Taylor-Rush v. Multitech Corp.* (1990) 217 Cal.App.3d 103, 114 [265 Cal.Rptr. 672] [exercising jurisdiction under the effects test because the defendant's contacts with California showed intentional targeting]; *Farris v. Capt. J. B. Fronapfel Co.* (1986) 182 Cal.App.3d 982, 990 [227 Cal.Rptr. 619] [finding that the "effects in California" of the defendant's tortious acts were "too remote in time and causal connection to fairly and justly require" the defendant "to come to California to defend himself"]; *Quattrone v. Superior Court* (1975) 44 Cal.App.3d 296, 304 [118 Cal.Rptr. 548] [exercising jurisdiction based on the effects of the defendant's tortious acts plus his other contacts with California].)

California. The record also contains no evidence of any LiVid contacts with California.

Although we have never considered the scope of personal jurisdiction based solely on Internet use, other courts have considered this issue, and most have adopted a sliding scale analysis. "At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. [Citation.] At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. [Citation.] The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." (*Zippo Mfg. Co. v. Zippo Dot Com, Inc.* (W.D.Pa. 1997) 952 F.Supp. 1119, 1124.)

Here, LiVid's Web site merely posts information and has no interactive features. There is no evidence in the record suggesting that the site targeted California. Indeed, there is no evidence that any California resident ever visited, much less downloaded the DeCSS source code from, the LiVid Web site. Thus, Pavlovich's alleged "conduct in . . . posting [a] passive Web site[] on the Internet is not," by itself, "sufficient to subject" him "to jurisdiction in California." (*Jewish Defense Organization, Inc. v. Superior Court* (1999) 72 Cal.App.4th 1045, 1060 [85 Cal.Rptr.2d 611] (*JDO*), fn. omitted [refusing to exercise jurisdiction under the effects test even though the defendant had "passive Web sites on the Internet"]; *Cybersell, Inc. v. Cybersell, Inc.* (9th Cir. 1997) 130 F.3d 414, 419-420 [refusing to exercise jurisdiction under the effects test even though the defendant posted infringing material on its Web site]; but see *Bunn-O-Matic I, supra,* 46 U.S.P.Q.2d at p. 1377 [suggesting that the operation of a Web site, by itself, is sufficient to establish express aiming at the forum state].) " 'Creating a site, like placing a product into the stream of commerce, may be felt nationwide—or even worldwide—but, without more, it is not an act purposefully directed toward the forum state.' " (*Cybersell,* at p. 418, quoting *Bensusan Restaurant Corp. v. King* (S.D.N.Y. 1996) 937 F.Supp. 295, 301, affd. (2d Cir. 1997) 126 F.3d 25.) Otherwise, "personal jurisdiction in Internet-related cases would almost always be found in any forum in the country." (*GTE New Media Services Inc. v. BellSouth Corp.* (D.C. Cir. 2000) 199 F.3d 1343,

1350.) Such a result would "vitiate long-held and inviolate principles of" personal jurisdiction. (*Ibid.*)

Nonetheless, DVD CCA contends posting the misappropriated source code on an Internet Web site is sufficient to establish purposeful availment in this case because Pavlovich knew the posting would harm not only a licensing entity but also the motion picture, computer and consumer electronics industries centered in California. According to DVD CCA, this knowledge establishes that Pavlovich intentionally targeted California and is sufficient to confer jurisdiction under the *Calder* effects test. Although the question is close, we disagree.

As an initial matter, DVD CCA's reliance on Pavlovich's awareness that an entity owned the licensing rights to the CSS technology is misplaced. Although Pavlovich knew about this entity, he did not know that DVD CCA was that entity or that DVD CCA's primary place of business was California until *after* the filing of this lawsuit. More importantly, Pavlovich could not have known this information when he allegedly posted the misappropriated code in October 1999, because DVD CCA only began administering licenses to the CSS technology in December 1999—*approximately two months later*. Thus, even assuming Pavlovich should have determined who the licensor was and where that licensor resided before he posted the misappropriated code, he would not have discovered that DVD CCA was that licensor.[4] Because Pavlovich could not have known that his tortious conduct would harm DVD CCA in California when the misappropriated code was first posted, his knowledge of the existence of a licensing entity cannot establish express aiming at California.[5]

Thus, the only question in this case is whether Pavlovich's knowledge that his tortious conduct may harm certain industries centered in California—i.e.,

---

[4]At oral argument, DVD CCA claimed that Pavlovich had received a cease-and-desist letter from the Motion Picture Association (MPA), and contended his receipt of this letter established purposeful availment. Although the complaint alleged that MPA sent such a letter to various Web sites and Internet service providers, the record contains no copy of this letter. Moreover, nothing in the record indicates that such a letter was sent to Pavlovich or that he received or even knew about the letter. Accordingly, DVD CCA's unsubstantiated allusion to a cease-and-desist letter cannot support a finding of jurisdiction. In any event, DVD CCA made no mention of this letter to the trial court and Court of Appeal or in its briefs to this court. Thus, it has waived the issue.

[5](See, e.g., *JDO, supra,* 72 Cal.App.4th at p. 1059 [refusing to exercise jurisdiction under the effects test because the defendant did not know that the plaintiff would suffer harm in the forum state]; *Chaiken v. VV Pub. Corp.* (2d Cir. 1997) 119 F.3d 1018, 1029 [refusing to exercise jurisdiction under the effects test because the defendant had no reason to believe that the plaintiffs would suffer harm in the forum state]; *Search Force, Inc. v. Dataforce Intern., Inc.* (S.D.Ind. 2000) 112 F.Supp.2d 771, 780 [refusing to exercise jurisdiction under the effects test because the defendant was not aware of the plaintiff's use of the trademark before the defendant created its infringing Web site]; *Tech Heads, Inc. v. Desktop Service Center, Inc.* (D.Or. 2000) 105 F.Supp.2d 1142, 1148 [refusing to exercise jurisdiction under the effects

the motion picture, computer, and consumer electronics industries—is sufficient to establish express aiming at California. As explained below, we conclude that this knowledge, by itself, cannot establish purposeful availment under the effects test.

First, Pavlovich's knowledge that DeCSS could be used to illegally pirate copyrighted motion pictures on DVD's and that such pirating would harm the motion picture industry in California does not satisfy the express aiming requirement. As an initial matter, we question whether these effects are even relevant to our analysis, because DVD CCA does not assert a cause of action premised on the illegal pirating of copyrighted motion pictures. (See *Cornelison v. Chaney* (1976) 16 Cal.3d 143, 148 [127 Cal.Rptr. 352, 545 P.2d 264] [specific jurisdiction "depends upon the quality and nature of [the defendant's] activity in the forum *in relation to the particular cause of action*" (italics added)].) In any event, "the mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.' " (*World-Wide Volkswagen, supra*, 444 U.S. at p. 298 [100 S.Ct. at p. 567], quoting *Hanson, supra*, 357 U.S. at p. 253 [78 S.Ct. at pp. 1239-1240].) "[T]he fact that a defendant's actions in some way set into motion events which ultimately injured a California resident" cannot, by itself, confer jurisdiction over that defendant. (*Wolfe, supra*, 217 Cal.App.3d at p. 547.) Thus, the foreseeability that third parties may use DeCSS to harm the motion picture industry cannot, by itself, satisfy the express aiming requirement. Because nothing in the record suggests that Pavlovich encouraged Web site visitors to use DeCSS to illegally pirate copyrighted motion pictures, his mere "awareness" they might do so does not show purposeful availment. (See *Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102, 112 [107 S.Ct. 1026, 1032, 94 L.Ed.2d 92] (plur. opn. of O'Connor, J.) [the mere awareness that third parties will sweep the defendant's product into the forum state does not convert its act of selling the product to third parties "into an act purposefully directed toward the forum State"].)

Second, Pavlovich's knowledge of the effects of his tortious conduct on the consumer electronics and computer industries centered in California is an even more attenuated basis for jurisdiction. According to DVD CCA, Pavlovich knew that posting DeCSS would harm the consumer electronics and computer industries in California, because many licensees of the CSS technology resided in California. The record, however, indicates that Pavlovich

test because the defendant did not know about the plaintiff or its presence in the forum state]; *Perry v. RightOn.com* (D.Or. 2000) 90 F.Supp.2d 1138, 1141 [refusing to exercise jurisdiction under the effects test because the defendant did not know about the plaintiff or his residence when the defendant acquired the infringing domain name]; *Rannoch, Inc. v. Rannoch Corp.* (E.D.Va. 1999) 52 F.Supp.2d 681, 685 [refusing to exercise jurisdiction under the effects test because the defendant did not know about the plaintiff or its trademarks].)

did not know that any of DVD CCA's licensees resided in California. At most, the record establishes that Pavlovich should have guessed that these licensees resided in California because there are many consumer electronic and computer companies in California. DVD CCA's argument therefore boils down to the following syllogism: jurisdiction exists solely because Pavlovich's tortious conduct had a foreseeable effect in California. But mere foreseeability is not enough for jurisdiction. (See *Bancroft, supra*, 223 F.3d at p. 1087.) Otherwise, the commission of any intentional tort affecting industries in California would subject a defendant to jurisdiction in California. We decline to adopt such an expansive interpretation of the effects test. (See *Callaway Golf Corp. v. Royal Canadian Golf Ass'n* (C.D.Cal. 2000) 125 F.Supp.2d 1194, 1200 ["Merely knowing a corporate [plaintiff] *might* be located in California does not fulfill the effects test" (italics added)].)

Cases citing a defendant's knowledge of the effects of its tortious conduct on an industry centered in the forum state to support a finding of jurisdiction under the effects test are inapposite. In exercising jurisdiction, those courts concluded that the defendant's knowledge of industry-wide effects in the forum state *in conjunction with other* evidence of express aiming at the forum state established purposeful availment under the effects test.[6] Thus, those cases merely hold that such knowledge is relevant to any determination of personal jurisdiction. They do not establish that such knowledge, by itself, establishes express aiming. Indeed, DVD CCA does not cite, and we have not found, any case where a court exercised jurisdiction under the effects test based solely on the defendant's knowledge of industry-wide effects in the forum state.

This dearth of supporting case law is understandable when we consider the ramifications of a contrary holding. According to DVD CCA, California should exercise jurisdiction over Pavlovich because he *should have known* that third parties *may* use the misappropriated code to illegally copy movies on DVD's and that licensees of the misappropriated technology resided in California. In other words, DVD CCA is asking this court to exercise jurisdiction over a defendant because he *should have known* that his conduct *may* harm—not a California plaintiff—but industries associated with that plaintiff. As a practical matter, such a ruling makes foreseeability of harm

---

[6](See *Panavision, supra*, 141 F.3d at p. 1322 [the defendant "engaged in a scheme to register [a forum resident's] trademarks as his domain names for the purpose of extorting money from" that resident]; *Cable News Network v. GoSMS.com, Inc.* (S.D.N.Y. 2000) 56 U.S.P.Q.2d 1959, 1963 [2000 WL 1678039, *4] [the defendant "transmitted infringing content to" forum residents]; *3DO Co. v. Poptop Software Inc.* (N.D.Cal. 1998) 49 U.S.P.Q.2d 1469, 1472 [1998 U.S. Dist. Lexis 21281] [the defendants "encourage[d] and facilitate[d] users" in the forum state "to *download* allegedly infringing copies" from its Web site and used a server in the forum state to operate the site].)

the sole basis for jurisdiction in contravention of controlling United States Supreme Court precedent. (See *Burger King, supra,* 471 U.S. at p. 474 [105 S.Ct. at p. 2183].)

Indeed, such a broad interpretation of the effects test would effectively eliminate the purposeful availment requirement in the intentional tort context for select plaintiffs. In most, if not all, intentional tort cases, the defendant is or should be aware of the industries that may be affected by his tortious conduct. Consequently, any plaintiff connected to industries centered in California—i.e., the motion picture, computer, and consumer electronics industries—could sue an out-of-state defendant in California for intentional torts that *may* harm those industries. For example, any creator or purveyor of technology that enables copying of movies or computer software—including a student in Australia who develops a program for creating backup copies of software and distributes it to some of his classmates or a store owner in Africa who sells a device that makes digital copies of movies on videotape—would be subject to suit in California because they should have known their conduct may harm the motion picture or computer industries in California.[7] Indeed, DVD CCA's interpretation would subject any defendant who commits an intentional tort affecting the motion picture, computer, or consumer electronics industries to jurisdiction in California even if the plaintiff was not a California resident. Under this logic, plaintiffs connected to the auto industry could sue any defendant in Michigan, plaintiffs connected to the financial industry could sue any defendant in New York, and plaintiffs connected to the potato industry could sue any defendant in Idaho. Because finding jurisdiction under the facts in this case would effectively subject all intentional tortfeasors whose conduct may harm industries in California to jurisdiction in California, we decline to do so.[8]

We, however, emphasize the narrowness of our decision. A defendant's knowledge that his tortious conduct may harm industries centered in California is undoubtedly relevant to any determination of personal jurisdiction and may support a finding of jurisdiction. We merely hold that this knowledge *alone* is insufficient to establish express aiming at the forum state as required by the effects test. Because the only evidence in the record even suggesting express aiming is Pavlovich's knowledge that his conduct may harm industries centered in California, due process requires us to decline jurisdiction over his person.

[7]Pavlovich claims—and DVD CCA does not dispute—that DeCSS may be used for legitimate, and not just illegal, purposes. Thus, Pavlovich is no different from the student or store owner in the hypothetical.

[8]We disapprove of *Nam Tai Electronics, Inc. v. Titzer* (2001) 93 Cal.App.4th 1301 [113 Cal.Rptr.2d 769], to the extent it is contrary to our decision today.

In addition, we are not confronted with a situation where the plaintiff has no other forum to pursue its claims and therefore do not address that situation. DVD CCA has the ability and resources to pursue Pavlovich in another forum such as Indiana or Texas. Our decision today does not foreclose it from doing so. Pavlovich may still face the music—just not in California.

III

Accordingly, we reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

Kennard, J., Werdegar, J., and Moreno, J., concurred.

**BAXTER, J.**—I respectfully dissent. That this case involves a powerful new medium of electronic communication, usable for good or ill, should not blind us to the essential facts and principles. The record indicates that, by intentionally posting an unlicensed decryption code for the Content Scrambling System (CSS) on their Internet Web sites, defendant and his network of "open source" associates sought to undermine and defeat the very purposes of the licensed CSS encryption technology, i.e., *copyright protection* for movies recorded on digital versatile discs (DVD's) and *limitation of playback* to operating systems licensed to unscramble the encryption code. The intended targets of this effort were not individual persons or businesses, but entire industries. Defendant knew at least two of the intended targets—the movie industry and the computer industry involved in producing the licensed playback systems—either were centered in California or maintained a particularly substantial presence here. Thus, the record amply supports the trial court's conclusion, for purposes of specific personal jurisdiction, that defendant's intentional act, even if committed outside California, was "expressly aimed" at California. (See *Calder v. Jones* (1984) 465 U.S. 783, 788-790 [104 S.Ct. 1482, 1486-1487, 79 L.Ed.2d 804] (*Calder*).)

In the particular circumstances, it cannot matter that defendant may not have known or cared about the *exact identities* or *precise locations* of each individual target, or that he happened to employ a so-called passive Internet Web site, or whether any California resident visited the site. By acting with the broad intent to harm *industries he knew were centered or substantially present in this state*, defendant forged sufficient "minimum contacts" with *California* "that he should reasonably anticipate being haled into court [*here*]" (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 [100 S.Ct. 559, 567, 62 L.Ed.2d 490] (*World-Wide Volkswagen*)) for litigation " 'aris[ing] out of' " his forum-related conduct (*Vons Companies, Inc. v.*

*Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 451 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (*Vons*)).

Moreover, defendant has made no "compelling case" (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 477 [105 S.Ct. 2174, 2184-2185, 85 L.Ed.2d 528] (*Burger King*)) that California's assertion of personal jurisdiction for this purpose otherwise fails to "comport with 'fair play and substantial justice.' " (*Burger King, supra*, at p. 476 [105 S.Ct. at p. 2184], quoting *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 320 [66 S.Ct. 154, 160, 90 L.Ed. 95, 161 A.L.R. 1057] (*Internat. Shoe Co.*).) Quite the contrary. Defendant identifies no unconscionable burden of defending the suit here, nor does he suggest California litigation would infringe any significant sovereignty interests of other jurisdictions.

But California has a substantial interest in the subject matter, and California appears a fair, convenient, and effective forum for California-centered industries to obtain relief. Moreover, this action seeks injunctions against a large number of persons, geographically dispersed, who are alleged to have participated with defendant in an organized effort to infringe and defeat DVD encryption. Thus, so long as the defendants' due process rights are not compromised, the interests of both the plaintiff and the interstate judicial system "in obtaining the most efficient resolution of controversies" (*World-Wide Volkswagen, supra*, 444 U.S. 286, 292 [100 S.Ct. 559, 564]) strongly favor suit against all in a single forum, rather than a multiplicity of suits in the defendants' individual domiciles. Accordingly, I conclude the Court of Appeal's judgment should be affirmed.

### FACTS

As the majority opinion indicates, DVD's are a means of storing digitally formatted information, including video information, on convenient 5-inch discs. One major use of DVD's, probably the best known to the consuming public, is as a medium for storing and viewing copyrighted motion pictures. Before the commercial release of movies on DVD's, the motion picture and DVD industries developed CSS. This encryption technology was designed to protect DVD movies against unauthorized copying and to allow playback of CSS-encrypted DVD's only on operating systems with CSS decryption capability. To protect the trade secret represented by CSS, the technology and its descrambling codes were disclosed only subject to licensing agreements.

Plaintiff DVD Copy Control Association, Inc. (DVD CCA) is a nonprofit trade association organized under Delaware law, but with its principal place

of business in Morgan Hill, California. DVD CCA was created by the motion picture and DVD industries to administer the licensing of CSS. No later than December 1999, DVD CCA took over administration of the licenses.

DVD CCA immediately filed suit in California superior court against defendant Matthew Pavlovich, 20 other named individuals, and 500 Does for misappropriation of trade secrets. The complaint alleges the following: As early as October 25, 1999, Jon Johansen, a resident of Norway, posted on the Internet a computer program, dubbed DeCSS, that defeats CSS encryption. DeCSS was derived by "willfully 'hacking' and/or improperly reverse engineering software created by" a CSS licensee. Around the time Johansen posted the DeCSS program, the same information appeared on a Web site "operated by" Pavlovich. Thereafter, many other Web sites "in at least 11 states and 11 countries" either posted the code directly or provided links to the sites where it appeared directly. The defendants who posted or provided Web site links to this information knew or should have known DeCSS was derived from the misappropriation of proprietary information, because DeCSS was specifically designed to defeat CSS and was aimed at infringing movie copyrights by permitting the "pirating" of movies on DVD's. The motion picture industry—centered in California—and the computer and electronics businesses involved in DVD development and production—including 73 companies in California—have been harmed because the wholesale copying and distribution of DVD's destroys both the movies' copyrights and the market for DVD-based products. The breach of CSS has also delayed the introduction of DVD audio—a new technology in which these industries have invested substantially—while a new copyright protection system is developed.

The complaint further asserts: The Motion Picture Association sent cease-and-desist notices to some 66 Web sites and Internet service providers, including Pavlovich and all but one of the other named defendants. Some who received notices had voluntarily removed the DeCSS information, but Pavlovich and all the other named defendants who were notified had refused.

The complaint asks for a declaratory judgment that defendants have willfully misappropriated the CSS trade secret. It seeks to enjoin the defendants, singly or in combination, from distributing, via the Internet or otherwise, any proprietary information or trade secrets relating to the CSS technology, and from copying, marketing, licensing, publishing, selling, leasing, or renting the DeCSS program and any other product substantially derived from CSS proprietary property or trade secrets.

Pavlovich moved to quash summons, alleging that California courts lacked personal jurisdiction over him. The motion, and DVD CCA's opposition, attached considerable documentary evidence, including excerpts from

Pavlovich's depositions. Much is fiercely disputed between the parties, but the record discloses the following facts that are either uncontroverted, or are fairly inferable in support of the trial court's jurisdiction order:

Pavlovich is the president of a startup technology consulting company. He currently lives and works in Texas, and he has no direct business or personal ties with California. While a computer engineering student in Indiana, he was the founder and project leader of the LiVid video project. The project operated a Web site at livid.on.openprojects.net, which posted the DeCSS source code.[1]

According to Pavlovich, LiVid was "an organization of software developers and computer programmers from around the world that were interested in . . . developing . . . video and DVD-related applications" for the Linux computer operating system. The project's goal, according to Pavlovich, was to "improve video and DVD support" for Linux and, in particular, "to develop an open source DVD player for Linux" so "we could play . . . DVDs . . . on the systems that we had bought that had DVD drives . . . ." In other DeCSS-related litigation, Pavlovich himself has testified as an expert witness "relating to computers, primarily Linux DVD technology," specifically including "various projects in Linux including the Linux video and DVD project."

By the time the LiVid Web site posted the DeCSS source code, Pavlovich had heard there was an entity that licensed CSS technology. As Pavlovich explained, "[i]n the course of the development of the . . . Linux video and DVD project, there was a lot of discussion regarding the decryption piece of the full length of decoding of DVD," and people on the LiVid mailing list

---

[1]Pavlovich vigorously disputes whether DVD CCA has shown, for purposes of personal jurisdiction over him, that the DeCSS source code actually *was* posted on the LiVid Web site, and if so, whether Pavlovich himself had any responsibility for the posting. In his declaration attached to the motion to quash, Pavlovich carefully avoided either admitting or denying that DeCSS was posted on the site, or that he was personally involved, though he acknowledged he had "input" into the site. In excerpts from his deposition, as presented to the trial court, Pavlovich several times described himself as the "founder and leader" of the LiVid project, but these deposition excerpts shed no further light on whether, or by whom, the DeCSS source code was posted. In his brief on the merits, Pavlovich urges affirmatively that his "sole connection" to the case is as "one of many contributors" to a Web site which "allegedly" posted information in derogation of the CSS trade secret. At oral argument in this court, Pavlovich's counsel insisted it is not clear by whom, or even whether, the DeCSS source code was posted on the LiVid Web site; counsel represented that no such material was found among the contents of Pavlovich's computer hard drive, as provided during discovery on the motion to quash. But in light of Pavlovich's claim of his predominant role in LiVid, his admission that he had input into the project's Web site, and his artful failure to deny the Web site posting or his involvement therein, I conclude the trial court was entitled, based on the evidence *before it*, to draw the inferences necessary for personal jurisdiction.

were advising that "you've got to apply for a license." A CSS licensee posted on the site a friendly warning that CSS was a licensed trade secret which licensees were forbidden to disclose, that its purpose was to prevent the pirating of movies from DVD's, that Hollywood was "paranoid" about pirating, and that if CSS were "cracked," there was a "good chance" no new movie titles would be released on DVD. Nonetheless, the project declined to seek a license because, as Pavlovich indicated, "more than likely a license would not allow us to release the source code and things like that that didn't follow the same development path as open source followed."

Pavlovich also understood that DeCSS had been "reverse engineered from another [CSS-equipped] DVD player like a Windows player." In an e-mail dated October 1, 1999, he advised that "[r]everse engineering is illegal in most (if not all) of the countries that developers in this project live in." Nonetheless, Pavlovich's e-mail predicted that although "[t]his is a very nasty thing and a lot is on the line for those involved," "DVD (everything non-free) will be hacked before the end of time."

In his deposition, Pavlovich insisted the LiVid project was not directly concerned with the unauthorized reproduction and distribution of copyrighted materials contained on DVD's. However, Pavlovich admitted he was aware that DeCSS could facilitate the process of transferring the information stored on the discs to computer hard drives, whence it could be copied into new playback mediums.[2] Indeed, Pavlovich insisted that one who buys a DVD with copyrighted material should have the freedom to duplicate it, at least for personal use, and to transfer its information to any other playback format he or she wishes.

Pavlovich insists he did not know the identity or location of the CSS licensing entity until this lawsuit was filed. However, he did know that the movie industry was centered in California and that computer companies of the kind involved in producing components for DVD players had a substantial presence here. Specifically, Pavlovich admitted, "the general common idea is that Hollywood is the area" where the movie industry is centered, that several major movie studios are located or have substantial presences in Hollywood, that Silicon Valley is one of the "top three technology hot spots in the United States," that computer hardware manufacturers are involved in

---

[2]There is some controversy among those familiar with DVD technology, and with the CSS system in particular, whether CSS encryption itself prevents the copying of materials contained on CSS-encoded DVD's. However, in a recent federal case involving the federal Digital Millennium Copyright Act (17 U.S.C.A. § 1201 et seq.), the court of appeals upheld district court findings that DeCSS "sidesteps" whatever anticopying protections are contained on standard DVD's and is the "superior" means of acquiring easily copyable movies. (*Universal City Studios, Inc. v. Corley* (2d Cir. 2001) 273 F.3d 429, 438, fn. 5.)

the production of DVD player components such as "video boards" or "DVD boards," and that "a lot" of hardware manufacturers are located in California.

In a brief order, the trial court denied the motion, citing *Calder, supra,* 465 U.S. 783, and a Ninth Circuit Court of Appeals case applying *Calder, Panavision Intern., L.P. v. Toeppen* (9th Cir. 1998) 141 F.3d 1316 (*Panavision*). Pavlovich petitioned the Court of Appeal for a writ of mandate. The petition was summarily denied. On review, we retransferred the matter to the Court of Appeal with directions to vacate its denial order and issue an order to show cause. After briefing and argument, the Court of Appeal wrote an opinion denying the writ.

The Court of Appeal reasoned that (1) Pavlovich knew or should have known his Internet activities were having injurious effects on the California movie and computer industries, (2) he also necessarily knew the misappropriated material posted on his Web site was instantly accessible to a wide range of Internet users and consumers, including those in California, (3) his use of the Internet, rather than older mass communications media, as the means of inflicting harm was irrelevant, and (4) the instant access afforded by an Internet Web site is the equivalent of the site operator's personal presence wherever the site's material is accessed and appropriated. Hence, the Court of Appeal concluded, though physically absent from California, Pavlovich had established minimum jurisdictional contacts with this state under a theory of "purposeful availment" of its benefits and privileges, because, by his intentional conduct, he had caused harmful effects in the state.

The Court of Appeal further concluded that personal jurisdiction over Pavlovich was reasonable under all the circumstances. It stressed that (1) the degree of Pavlovich's personal interjection was substantial, because his knowing activity posed substantial harm for industries centered in California; (2) the burden of defending the suit in California was substantial, but not so great as to deny Pavlovich due process; (3) Pavlovich identified no conflict with the sovereignty of his home state; (4) California had a substantial interest in the subject matter; (5) California offered a logical forum for convenient, efficient, and effective resolution of the dispute; and (6) no other forum could claim a greater interest.

## DISCUSSION

The majority correctly state the broad principles. California may assert personal jurisdiction over a foreign defendant on any basis consistent with

the state and federal Constitutions. (Code Civ. Proc., § 410.10.) Such jurisdiction is constitutionally permissible only "if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' " (*Vons, supra,* 14 Cal.4th 434, 444, quoting *Internat. Shoe Co., supra,* 326 U.S. 310, 316 [66 S.Ct. 154, 158]; see *Burger King, supra,* 471 U.S. 462, 471-478 [105 S.Ct. 2174, 2181-2185].)

The "minimum contacts" rule protects both the defendant's "liberty interest in not being subject to the judgments of a forum with which he or she has established no meaningful 'contacts, ties, or relations' " (*Vons, supra,* 14 Cal.4th 434, 445; *Burger King, supra,* 471 U.S. 462, 471-472 [105 S.Ct. 2174, 2181]) and the mutual territorial limits of coequal sovereigns in a federal system (*Vons, supra,* at p. 445; see *World-Wide Volkswagen, supra,* 444 U.S. 286, 292 [100 S.Ct. 559, 564-565]). The rule also " 'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.' " (*Burger King, supra,* at p. 472 [105 S.Ct. at p. 2182], quoting *World-Wide Volkswagen, supra,* at p. 297 [100 S.Ct. at p. 567].)

But the test of minimum contacts is necessarily flexible, and, as the majority concede, subtle shades of grays predominate. (Maj. opn., *ante,* at p. 268; see *Kulko v. California Superior Court* (1978) 436 U.S. 84, 92 [98 S.Ct. 1690, 1696-1697, 56 L.Ed.2d 132] (*Kulko*).) "[T]he question of jurisdiction cannot be answered by the application of precise formulas or mechanical rules. Each case must be decided on its own facts." (*Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 583 [122 Cal.Rptr.2d 24] (*Integral Development Corp.*); see *Cornelison v. Chaney* (1976) 16 Cal.3d 143, 150 [127 Cal.Rptr. 352, 545 P.2d 264] (*Cornelison*).)

For particular litigation, the "fair warning" standard that underlies the minimum contacts rule "is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum [citation], and the litigation results from alleged injuries that 'arise out of or relate to' those activities [citation]." (*Burger King, supra,* 471 U.S. 462, 472 [105 S.Ct. 2174, 2182]; see also *Helicopteros Nacionales de Colombia v. Hall* (1984) 466 U.S. 408, 414 [104 S.Ct. 1868, 1872, 80 L.Ed.2d 404]; *Vons, supra,* 14 Cal.4th 434, 446.) As *Burger King* explained, there are several reasons why personal jurisdiction is appropriate in such cases. A state generally has a manifest interest in providing its residents a forum for redressing injuries inflicted by out-of-state actors. When such persons "purposefully derive benefit" from their interstate activities (*Kulko, supra,* 436 U.S. 84, 96 [98 S.Ct. 1690,

1699]), it may well be unfair to allow them to raise a territorial shield against efforts to hold them to account where injury proximately resulted. Also, modern transportation and communications have made it much less burdensome, and thus less unfair, to require one to litigate in another forum for disputes relating to such activity. (*Burger King, supra*, at pp. 473-474 [105 S.Ct. at pp. 2182-2183]; see also *Keeton v. Hustler Magazine, Inc.* (1984) 465 U.S. 770, 776 [104 S.Ct. 1473, 1479, 79 L.Ed.2d 790] (*Keeton*); *McGee v. International Life Ins. Co.* (1957) 355 U.S. 220, 223 [78 S.Ct. 199, 201, 2 L.Ed.2d 223]; *Vons, supra*, at p. 447.)

The necessary purposeful direction toward the forum has sometimes been described as requiring "some act by which the defendant purposefully *avails* itself of the *privilege* of conducting activities within the forum [s]tate, thus invoking the *benefits and protections of its laws*." (*Hanson v. Denckla* (1958) 357 U.S. 235, 253 [78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283], italics added.) But purposeful availment in this literal sense is not the only form of purposeful direction that will permit the exercise of personal jurisdiction over a foreign defendant.

Thus, in *Calder, supra*, 465 U.S. 783, the court concluded that California actress Shirley Jones could bring a California suit against Florida residents who wrote and edited an allegedly defamatory article about her which appeared in a nationally circulated tabloid newspaper. The court concluded that, despite their lack of any direct personal or business ties to California, the individual defendants had "expressly aimed" their intentional conduct at this state. (*Calder, supra*, at p. 789 [104 S.Ct. at p. 1487].) *Calder* stressed that the defendants' newspaper had prominent circulation in California, and that California was the focal point of the story, because the defendants consulted California sources and knew the brunt of the harm, both emotional and reputational, would be felt in this state, where Jones lived and pursued her professional career. (*Id.* at pp. 788-790 [104 S.Ct. at pp. 1486-1487].)

California has similarly assumed that, because of this state's " 'natural interest in the effects of an act within its territory, even though the act itself was done elsewhere' " (Judicial Council of Cal., com., reprinted at 14 West's Ann. Code Civ. Proc. (1973 ed.) foll. § 410.10, p. 472, quoting Rest.2d Conf. of Laws (Proposed Off. Draft (1967) pt. I) § 37, com. a, p. 197), one whose out-of-state act was *intended* to cause effects here may be sued in this state for the act just as if it had occurred here (Judicial Council of Cal., com., reprinted at 14 West's Ann. Code Civ. Proc., *supra*, foll. § 410.10, p. 473; cf. *Sibley v. Superior Court* (1976) 16 Cal.3d 442, 446 [128 Cal.Rptr. 34, 546 P.2d 322] (*Sibley*) [state may exercise jurisdiction over foreign defendant who causes effects here unless nature of effects, and of defendant's relationship to this state, make exercise of jurisdiction unreasonable]).

One cannot be sued in a foreign jurisdiction "solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts [citations]." (*Burger King, supra,* 471 U.S. 462, 475 [105 S.Ct. 2174, 2183]; *Keeton, supra,* 465 U.S. 770, 774 [104 S.Ct. 1473, 1478].) But the minimum contacts necessary to personal jurisdiction are always present where the defendant has so *purposefully* directed injurious conduct toward the forum, with the *intent* of affecting its residents, " *'that he should reasonably anticipate being haled into court there'* " for related litigation. (*Burger King, supra,* at p. 474 [105 S.Ct. at p. 2183], quoting *World-Wide Volkswagen, supra,* 444 U.S. 286, 297 [100 S.Ct. 559, 567], italics added.)

In *Calder,* the court unanimously found that the Florida-based author and editor of an allegedly defamatory tabloid article about a California actress "must 'reasonably anticipate being haled into court [in California]' to answer for the truth of the statements made in their article. [Citations.]" (*Calder, supra,* 465 U.S. 783, 790 [104 S.Ct. 1482, 1487].) As the court observed, the defendants were "primary participants in an alleged wrongdoing *intentionally directed at a California resident,* and jurisdiction over them is proper on that basis." (*Ibid.,* italics added.) "An individual injured in California," the court said, "need not go to Florida to seek redress from persons who, though remaining in Florida, *knowingly cause the injury in California.*" (*Ibid.,* italics added.)

As the majority indicate, the *Calder* test of minimum contacts based upon conduct expressly aimed at the forum is not limited to defamation actions. It applies to intentional torts generally. (See, e.g., *Bancroft & Masters, Inc. v. Augusta Nat. Inc.* (9th Cir. 2000) 223 F.3d 1082, 1087-1088 (*Bancroft & Masters*); *Panavision, supra,* 141 F.3d 1316, 1321-1322; see also, e.g., *IMO Industries, Inc. v. Kiekert AG* (3d Cir. 1998) 155 F.3d 254, 260 (*IMO*); *Far West Capital, Inc. v. Towne* (10th Cir. 1995) 46 F.3d 1071, 1077.)

"When a defendant moves to quash service of process on jurisdictional grounds, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction. [Citation.] Once facts showing minimum contacts with the forum state are established, however, it becomes the defendant's burden to demonstrate that the exercise of jurisdiction is unreasonable. [Citation.] Where there is conflicting evidence, the trial court's factual determinations are not disturbed on appeal if supported by substantial evidence. [Citation.] When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record. [Citation.]" (*Vons, supra,* 14 Cal.4th 434, 449; cf. *Floveyor Internat., Ltd. v. Superior Court* (1997) 59 Cal.App.4th 789, 793-794 [69 Cal.Rptr.2d 457].)

When, as here, no findings of fact were requested or made, the trial court's implicit findings of disputed fact are entitled to the same appellate deference as explicit findings. (See *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1313 [92 Cal.Rptr.2d 418] [constitutionality, as applied, of cumulative housing code penalties].) Thus, we must accept all undisputed facts, indulge all other reasonable factual inferences that support the trial court's order, and independently apply the law to those facts. (*Integral Development Corp., supra,* 99 Cal.App.4th 576, 584-585; cf. *Gleaves v. Waters* (1985) 175 Cal.App.3d 413, 417 [220 Cal.Rptr. 621] [preliminary injunction].)

Application of these principles compels a conclusion that the unique circumstances of this case satisfy the fundamental requirements of *Calder.* For purposes of minimum contacts analysis, the following facts are either undisputed or fairly inferable from the record: The DeCSS source code was posted on defendant Pavlovich's LiVid Web site as part of a widespread effort to defeat the CSS encryption system jointly developed by the movie and DVD industries for their mutual protection and benefit. DeCSS was posted on the LiVid Web site despite Pavlovich's assumption that DeCSS illegally infringed the licensed trade secret represented by CSS.[3] Pavlovich, a technical expert in this area, knew CSS was intended to protect copyrighted materials on DVD's from unauthorized duplication, and also to limit DVD playback to systems with CSS technology. Indeed LiVid's goal in defeating CSS was to develop an alternative, and presumably competitive, "open source" DVD playback system. Thus, the intended injurious effects of posting DeCSS were aimed directly at the computer hardware industry involved in producing CSS-encrypted DVD players—an industry Pavlovich knew was heavily concentrated in California.

Moreover, Pavlovich knew the purpose of CSS was to protect copyrighted movies from pirating, and that the widespread availability of DeCSS undermined that interest. Thus, even if he did not personally pirate copyrighted material for commercial gain, Pavlovich, by publishing material he understood as an infringement of the CSS trade secret, took an action calculated to harm the movie industry, which Pavlovich knew was centered in California.

[3]As indicated above, this assumption is evidenced by Pavlovich's admission that he understood DeCSS had been derived by reverse engineering a DVD player equipped with CSS technology, and by his e-mail, dated October 1, 1999, warning that "[r]everse engineering is illegal in most (if not all) of the countries that developers in this project live in." Pavlovich now urges that under the Uniform Trade Secrets Act as applicable in California (Civ. Code, § 3426 et seq.), "[r]everse engineering . . . alone shall not be considered improper means" of acquiring a trade secret. (*Id.,* § 3426.1, subd. (a).) But the *merits* of DVD CCA's lawsuit are not before us at this preliminary stage. What counts for jurisdictional purposes is that Pavlovich engaged in intentional conduct, targeted against California interests, with the *understanding* that it would produce potentially actionable effects in this state, thus making it reasonable to anticipate that he would be haled into court here.

Accordingly, the necessary minimum contacts required by *Calder, supra,* 465 U.S. 783, are present. Pavlovich engaged in " '(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state.' " (*Panavision, supra,* 141 F.3d 1316, 1321, quoting *Core-Vent Corp. v. Nobel Industries AB* (9th Cir. 1993) 11 F.3d 1482, 1486 (*Core-Vent*).) Accordingly, he should reasonably anticipate he would be haled into *California's* courts to account for his conduct.

The majority ascribe undue significance to the fact that Pavlovich acted through a new and rapidly burgeoning medium of interstate and international communication—the Internet. They assert that the mere posting of information on a passive Internet Web site, which is accessible from anywhere but is directed at no particular audience, cannot be an action targeted at a particular forum. Otherwise, they worry, mere use of the Internet would subject the user to personal jurisdiction in any forum where the site was accessible.

I agree that *mere* operation of an Internet Web site cannot expose the operator to suit in any jurisdiction where the site's contents might be read, or where resulting injury might occur. (See, e.g., *Mink v. AAAA Development LLC* (5th Cir. 1999) 190 F.3d 333, 336-337 (*Mink*); *Oasis Corp. v. Judd* (S.D.Ohio 2001) 132 F.Supp.2d 612, 623; *Nicosia v. De Rooy* (N.D.Cal. 1999) 72 F.Supp.2d 1093, 1098; but see *Inset Systems, Inc. v. Instruction Set, Inc.* (D.Conn. 1996) 937 F.Supp. 161, 164-165 (*Inset Systems, Inc.*).) Communication by a universally accessible Internet Web site cannot be equated with "express aiming" at the entire world.

However, defendants who aim conduct at particular jurisdictions, expecting and intending that injurious effects will be felt in those specific places, cannot shield themselves from suit there simply by using the Internet, or some other generalized medium of communication, as the means of inflicting the harm. (See, e.g., *Calder, supra,* 465 U.S. 783, 789-790 [104 S.Ct. 1482, 1486-1487] [significant California circulation of nationwide newspaper supports California defamation suit by California resident against Florida residents who wrote and edited defamatory article]; *Keeton, supra,* 465 U.S. 770, 773-780 [104 S.Ct. 1473, 1477-1481] [significant regular circulation of nationwide magazine in New Hampshire supports New Hampshire defamation suit against magazine by well-known New York resident]; *Panavision, supra,* 141 F.3d 1316, 1319-1322 [California suit proper where Illinois defendant registered and used California plaintiff's trademarks as domain names for defendant's Internet Web sites, then solicited payoff to relinquish domain names]; *Indianapolis Colts v. Metro. Baltimore Football* (7th Cir. 1994) 34 F.3d 410, 411-412 (*Indianapolis Colts, Inc.*) [in Indiana trademark

infringement suit by former Baltimore (now Indianapolis) Colts of National Football League against Baltimore CFL Colts of Canadian Football League, defendant established minimum contacts with Indiana, among other ways, through nationwide cable telecasts of football games]; cf., e.g., *CompuServe, Inc. v. Patterson* (6th Cir. 1996) 89 F.3d 1257, 1262-1267 [Ohio declaratory relief action by Ohio-based Internet service provider is proper where Texas defendant transmitted "trademarked" software over the Internet to plaintiff, used plaintiff's Internet service to share and market software, then e-mailed plaintiff in Ohio, claiming names and marks of plaintiff's similar software infringed his trademarks]; *Bancroft & Masters, supra*, 223 F.3d 1082, 1084-1088 [California declaratory relief action is proper where defendant, based in Georgia, sent letters both to plaintiff, a California merchant, and to a Virginia-based Internet Web site domain name registrar, claiming plaintiff's registered domain name infringed defendant's trademark, thus forcing plaintiff to sue to retain control of domain name].)[4]

In such circumstances, the defendant is not exposed to universal and unpredictable jurisdiction. He faces suit only in a particular forum where he directed his injurious conduct, and where he must reasonably anticipate being called to account.

The cases cited by the majority for the proposition that operation or use of a passive Internet Web site cannot create personal jurisdiction in a state foreign to the operator's location are inapposite. Those decisions hold that personal jurisdiction cannot be based on *mere accessibility* to a Web site by residents of the forum state or otherwise conclude, on their individual facts, that particular *uses* of the Internet did not establish the geographic specificity, knowledge, and intent necessary for "express aiming."[5]

---

[4]The majority imply that the maintenance of a passive Internet Web site cannot be considered "express aiming" at any jurisdiction because such a site is just a way of allowing interested persons to search for and retrieve information stored in remote computers. (Maj. opn., *ante*, at p. 265, citing, for such a description of the World Wide Web, *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 849-852 [117 S.Ct. 2329, 2334-2335, 138 L.Ed.2d 874].) But the maintenance of a Web site that includes content intended and expected to harm particular individuals, entities, or interests in specific places is no more "passive" in this regard than television broadcasts which all or none may watch as they choose (see *Indianapolis Colts, Inc., supra*, 34 F.3d 410, 411-412), or a recorded toll-free telephone message which all or none may hear as they choose (cf. *Inset Systems, Inc., supra*, 937 F.Supp. 161, 165).

[5](E.g., *Jewish Defense Organization, Inc. v. Superior Court* (1999) 72 Cal.App.4th 1045, 1059 [85 Cal.Rptr.2d 611, 620] [assertion by plaintiff, who lives in New York and travels frequently, that he "spends 'considerable professional time' in California" is insufficient to show California was targeted when plaintiff was allegedly defamed by an individual and organization, both located in New York, using Internet services provided by companies with offices in California]; *Cybersell, Inc. v. Cybersell, Inc.* (9th Cir. 1997) 130 F.3d 414 (*Cybersell*) [Floridians' mere use of an allegedly infringing mark on a passive Web site home page

Next, the majority accept Pavlovich's argument that he cannot have expressly aimed his conduct at California because he knew neither the specific identity nor the location of the CSS *licensing agency* (now California-based plaintiff DVD CCA) at the time DeCSS was posted on the LiViD Web site. But knowledge of this exact kind is unnecessary to establish personal jurisdiction. When a foreign defendant, by intentional conduct directed toward the forum, establishes the necessary minimum contacts with that jurisdiction, he or she may be exposed to litigation there for any " 'controversy [that] is *related to* or *"arises out of"* [those] contacts . . . .' [Citations.]" (*Vons, supra*, 14 Cal.4th 434, 446, italics added.) The *plaintiff* need not be the exact person or entity toward whom the defendant's conduct was directed.

The facts of *Vons, supra*, 14 Cal.4th 434, are illustrative. There, customers of several Jack-in-the-Box restaurants were injured or killed by eating tainted hamburger. Other Jack-in-the-Box franchisees brought a California suit against Jack-in-the-Box's California parent company, Foodmaker, seeking damages for business losses caused by the adverse publicity. Foodmaker cross-complained against various parties, including California-based Vons, which shipped hamburger to Foodmaker for use in Jack-in-the-Box restaurants. Vons, in turn, cross-complained against Foodmaker and the franchises where food poisoning had occurred, including two Washington state restaurants. Vons alleged the injuries could have been avoided by proper cooking procedures.

promoting their business did not subject users to personal jurisdiction in Arizona, where mark's owners were located; there was no evidence defendants sought Arizona business or otherwise targeted Arizona with knowledge that harm would be suffered there]; *GTE New Media Service Inc. v. BellSouth Corp.* (D.C. Cir. 2000) 199 F.3d 1343 [mere evidence that foreign defendants sought to maximize use, within District of Columbia as elsewhere, of their Internet "yellow pages" service did not create District of Columbia jurisdiction for suit by competing Internet "yellow pages" service provider]; *Bensusan Restaurant Corp. v. King* (S.D.N.Y. 1996) 937 F.Supp. 295, affd. (2d Cir. 1997) 126 F.3d 25 (*Bensusan Restaurant Corp.*) [use of allegedly infringing logotype on Web site promoting independent Blue Note jazz club, which was located in Missouri, did not create New York personal jurisdiction in trademark infringement suit by owner-operator of Blue Note jazz clubs in New York and elsewhere]; see also, e.g., *Nam Tai Electronics, Inc. v. Titzer* (2001) 93 Cal.App.4th 1301 [113 Cal.Rptr.2d 769] [defendant Colorado resident, who posted alleged commercial libels against plaintiff Hong Kong company on an Internet bulletin board provided by Yahoo!, a California corporation, was not subject to California jurisdiction at plaintiff's behest simply because Yahoo!'s Web site was "maintained" in California and defendant's service agreement with Yahoo! stated that California jurisdiction would apply to disputes between Yahoo! and defendant].)

For purposes of this case, which does not involve direct *commercial* use of the Internet, I find little utility in those federal decisions that look to " 'the nature and quality of commercial activity that an entity conducts over the Internet' " to determine personal jurisdiction. (*Mink, supra*, 190 F.3d 333, 336, quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.* (W.D.Pa. 1997) 952 F.Supp. 1119, 1124.)

We held that for purposes of the particular litigation, jurisdiction over the Washington cross-defendants was proper, though they had no general ties with California, nor any direct contacts with Vons. As we explained, "the nexus required to establish specific jurisdiction is between the defendant, the *forum*, and the litigation [citations]—not between the plaintiff and the defendant." (*Vons, supra*, 14 Cal.4th 434, 458.) " 'The crucial inquiry concerns the character of [the] defendant's activity in the forum [and] whether the cause of action *arises out of or has a substantial connection with that activity* . . . .' " (*Id.*, at p. 452, quoting *Cornelison, supra*, 16 Cal.3d 143, 148, italics added by *Vons*.)

In *Vons*, this substantial connection between the Washington cross-defendants and Vons's California cross-complaint arose from the cross-defendants' California-centered contractual franchise relationship with *Foodmaker*. The cross-defendants bought all their hamburger from Foodmaker, and the standard franchise agreement, which provided that contractual disputes between Foodmaker and its franchisees would be litigated in California, set exacting standards for sanitary food preparation in Jack-in-the-Box restaurants. Hence, on the basis of their California contacts, the cross-defendants could reasonably anticipate a California lawsuit with respect to that subject. (*Vons, supra*, 14 Cal.4th 434, 456-460.)

Similarly here, defendant Pavlovich's connection with California arises from his participation in a concerted effort to defeat the CSS encryption system he knew was developed to protect interests of the movie and DVD-related computer industries. Those industries, as he also knew, were centered or substantially concentrated in this state. He knew CSS was a trade secret, available only by a license his LiVid project had specifically declined to obtain. He also assumed the DeCSS source code posted on the LiVid Web site had been derived by illegal means, and was an infringement of the proprietary information represented by CSS. DVD CCA's lawsuit, alleging that the Web site posting was an infringement of the CSS trade secret, thus " 'arises out of or has a substantial connection with' " his conduct aimed at this state. (*Vons, supra*, 14 Cal.4th 434, 452.) Because he targeted the trade secrets of industries he knew were centered in California, he must reasonably anticipate California litigation calling him to account for that conduct. That he did not know the exact identity or location of the entity authorized to prosecute such an action is immaterial.

The majority also accept Pavlovich's claim that his contacts with the California movie, computer, and consumer electronics industries are too random, remote, and attenuated to satisfy *Calder*'s express aiming test. (*Calder, supra*, 465 U.S. 783.) As to the *motion picture* industry, the majority

insist it is insufficient that Pavlovich knew the DeCSS source code could be used to harm that industry through the pirating of copyrighted motion pictures. The majority note that DVD CCA's lawsuit does not allege Pavlovich pirated movies, and they say express aiming at the movie industry cannot be found from the *mere foreseeability* that other persons might use the code to do so. As to the *computer and electronics* industries, the majority observe there is no evidence Pavlovich actually knew that California members of these industries were among the CSS licensees allegedly harmed by DeCSS. Finally, the majority suggest that a defendant's knowledge of *industry-wide* effects cannot form the sole basis for personal jurisdiction in any event.

It is true that one cannot be sued in another forum simply because his or her conduct has *foreseeable* effects there.[6] A number of lower court decisions suggest further that, absent other indicia of activity purposefully directed at the forum, even the defendant's intent to injure a forum resident, standing alone, is not sufficient to satisfy the test of *Calder, supra,* 465 U.S. 783.[7] And several cases have held that alleged trademark infringement on an Internet Web site cannot alone, under *Calder,* establish minimum contacts with the forum in which the trademark's owner resides.[8]

---

[6]E.g., *Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102, 112 [107 S.Ct. 1026, 1032, 94 L.Ed.2d 92] (*Asahi Metal Industry Co.*) (placing product into stream of commerce does not create minimum contact with every state to which product may foreseeably travel); *World-Wide Volkswagen, supra,* 444 U.S. 286, 298 [100 S.Ct. 559, 567-568] (mere foreseeability that vehicle sold by wholesale and retail dealers serving New York City metropolitan area would be taken to another state, such as Oklahoma, did not create dealers' minimum contacts with Oklahoma for products liability suit arising from Oklahoma accident); *Noonan v. Winston Co.* (1st Cir. 1998) 135 F.3d 85, 90-92 (French publisher's knowledge that copies of its magazine, containing offensive photo of Massachusetts resident, might reach that state is insufficient to satisfy *Calder*); see also *Sibley, supra,* 16 Cal.3d 442, 445-446.

[7]See, e.g., *IMO, supra,* 155 F.3d 254, 260-268 (the defendant German corporation's activities, outside New Jersey, which allegedly interfered with New Jersey-based company's efforts to sell its Italian subsidiary did not create minimum contacts between the defendant and New Jersey despite the defendant's knowledge that the plaintiff was headquartered there); *ESAB Group, Inc. v. Centricut, Inc.* (4th Cir. 1997) 126 F.3d 617, 625-626 (scheme, carried out in New Hampshire and Florida, at behest of defendant New Hampshire manufacturer, to procure, disclose, and use trade secrets and customer lists of the plaintiff, a South Carolina competitor, did not create minimum contacts with South Carolina despite the defendant's presumed intent to affect the plaintiff's business); *Hicklin Engineering, Inc. v. Aidco, Inc.* (8th Cir. 1992) 959 F.2d 738, 739 (actions by Michigan manufacturer, taken outside Iowa, to injure general business of Iowa competitor, did not create minimum contacts with Iowa).

[8]E.g., *Cybersell, supra,* 130 F.3d 414, 418-420; *Bensusan Restaurant Corp., supra,* 937 F.Supp. 295, 299-300; but see *Inset Systems, Inc., supra,* 937 F.Supp. 161, 164-165 (Massachusetts defendant directed its activities toward all states, including Connecticut, by advertising via Internet and toll-free telephone number; hence, Connecticut jurisdiction was proper for suit by Connecticut firm alleging that the defendant's Web site domain name infringed the plaintiff's trademark).

Nonetheless, I believe that the unusual and unprecedented facts of this case demonstrate *purposeful activity* directed toward this forum sufficient to establish minimum contacts under the *Calder* test. As a result of his actions, defendant Pavlovich should reasonably have anticipated being haled into court in this state, and recognition of California's jurisdiction thus meets constitutional standards of fairness.

The posting of the DeCSS source code on Pavlovich's LiVid Web site was done with the *specific goal* of negating, by illegal means, the licensed CSS technology Pavlovich knew had been jointly developed by the movie and DVD industries for their mutual protection. Pavlovich's immediate aim, he acknowledged, was to promote development of alternative DVD playback systems not dependent on CSS licensure. However, he also knew CSS was intended to afford crucial copyright protection to DVD movies. He has denied any personal desire to pirate movies, or to encourage others to do so. But by deciding to display the DeCSS source code without restriction on the universally accessible Web site, Pavlovich offered visitors to the site the patent opportunity to exploit this information as they chose.

By taking this calculated action, Pavlovich thus not only foresaw, but must have *intended,* the natural and probable consequences he knew would befall the affected industries. These consequences included *both* the competitive injury Pavlovich admitted he intended to inflict upon the DVD industry, which is substantially present in California, *and* the loss of copyright protection to the movie industry he knew is primarily associated with this state.

This lawsuit, brought by the agent of these affected industries, seeks to forestall just such damage by enjoining Pavlovich, and other members of his network, from continuing to display the DeCSS source code on their Web sites. (Civ. Code, § 3426.2, subd. (a).) For purposes of such an action, it is irrelevant whether Pavlovich himself exploited DeCSS for commercial benefit. The instant suit is predicated on the inherent harm to California-centered industries caused by Pavlovich's intentional, knowing, and allegedly improper "[d]isclosure" of their trade secret. (*Id.,* § 3426.1, subd. (b)(2).) Pavlovich knew he was targeting those industries when he acted. He proceeded despite his assumption that DeCSS was likely "illegal." He thus had every reason to expect—indeed, he effectively invited—responsive litigation.

For purposes of this particular action, therefore, he established sufficient connection with this state that he must "reasonably anticipate" being haled into a *California* court to account for his conduct. (*World-Wide Volkswagen,*

*supra*, 444 U.S. 286, 297 [100 S.Ct. 559, 567-568]; see *Burger King, supra*, 471 U.S. 462, 474 [105 S.Ct. 2174, 2183].) Because of the minimum contacts he forged by his intentional conduct directed toward this state, maintenance of a related suit against him in this forum does not offend traditional notions of fair play and substantial justice. (*Calder, supra*, 465 U.S. 783, 787-788 [104 S.Ct. 1482, 1486]; see *Internat. Shoe Co., supra*, 326 U.S. 310, 316, 320 [66 S.Ct. 154, 160; see also *Integral Development Corp., supra*, 99 Cal.App.4th 576, 587 [suggesting that, even absent prior employer-employee relationship, California suit by California corporation against resident of Germany for misappropriation of trade secrets would be proper under *Calder* on basis that defendant directed his intentional tortious conduct toward a known forum resident].).[9]

I see no reason why the result should differ simply because Pavlovich targeted entire industries within the forum, rather than a single individual or business. The majority suggest there is no case "where a court exercised jurisdiction under the effects test based solely on the defendant's knowledge of industry-wide effects in the forum state." (Maj. opn., *ante*, at p. 277.) By the same token, however, no decision has held that the defendant's efforts to target an entire industry *cannot* form a basis for specific personal jurisdiction. Jurisdiction is appropriate under *Calder* whenever a foreign defendant expressly aimed injurious actions toward *the forum*, with the intent and understanding that the brunt of the harm would be felt there. (*Calder, supra*, 465 U.S. 783, 788-790 [104 S.Ct. 1482, 1486-1487].) While targeting of an individual forum resident certainly meets that test, the aiming is no less

---

[9]The majority reject *Janmark, Inc. v. Reidy* (7th Cir. 1997) 132 F.3d 1200, deeming it the only federal decision that would support jurisdiction over Pavlovich, because, they conclude, it stands for the unpersuasive notion that jurisdiction over an intentional tort is always proper where the injury, or at least foreseeable injury, occurred. In *Janmark*, a California manufacturer of minishopping carts was sued in Illinois by an Illinois competitor. The plaintiff alleged that when it refused to participate in the defendant's cartel scheme, the defendant retaliated by inducing a New Jersey customer to cancel an order for the plaintiff's carts. The court of appeals found jurisdiction proper on grounds that the alleged tort was not complete until the customer cancelled the order; accordingly, the court ruled, "the injury and thus the tort occurred in Illinois" for purposes of that state's long-arm statute. (*Id.* at p. 1202.) Whatever the merits of this reasoning, the court additionally noted, without extended discussion, that Illinois jurisdiction also satisfied the *Calder* test. I pass no final judgment on *Janmark*, but I do not believe it stands for so broad or unsupportable a proposition as the majority contend. The plaintiff in *Janmark* posited a scenario in which the defendant, who knew the plaintiff's identity and Illinois location, attempted to obtain the plaintiff's cooperation in a monopolistic scheme, and, when that effort failed, took revenge by acting for the express purpose of causing commercial injury to the plaintiff. I do not find this fact pattern lacking in *Calder*'s requirement of particularized " 'knowledge and intent in committing the tortious activity' " (maj. opn., *ante*, at p. 272, quoting *IMO, supra*, 155 F.3d 254, 264), nor do I construe *Janmark* as permitting jurisdiction based solely on mere " '[f]oreseeability of causing *injury* in another State' " (maj. opn., *ante*, at p. 272, quoting *Burger King, supra*, 471 U.S. 462, 474 [105 S.Ct. 2174, 2183], original italics omitted).

specific, and jurisdiction no less proper, when the effort is directed, with equal purpose and precision, at one or more entire industries located there.

Pavlovich insists he did not aim at California in particular, because movie and computer companies exist throughout the nation and world. Moreover, he asserts, we may not assume large companies, with widely dispersed interests and operations, suffer the "brunt of the harm" in California simply because they are headquartered here.

Some cases have suggested that "a corporation 'does not [necessarily] suffer harm in a particular geographic location in the same sense that an individual does.'" (*Cybersell, supra,* 130 F.3d 414, 420, quoting *Core-Vent, supra,* 11 F.3d 1482, 1486; see also *IMO, supra,* 155 F.3d 254, 262-263, and cases cited.) But other decisions have implicitly rejected the argument that, for purposes of *Calder,* acts intended to harm a corporation cannot be said to be directed at any particular place. (*Core-Vent, supra,* at p. 1487.)

*Calder* "does not preclude a determination that a corporation suffers the brunt of harm in its principal place of business." (*Panavision, supra,* 141 F.3d 1316, 1322, fn. 2; see *Core-Vent, supra,* 11 F.3d 1482, 1487.) It seems reasonable that, for purposes of litigation arising from tortious conduct purposefully directed against the general commercial interests of particular business enterprises, those businesses may be deemed to have suffered the "brunt of the harm," and the actor may reasonably anticipate suit, in the state where he or she knew they maintained their principal places of business. (*Panavision, supra,* at p. 1322, fn. 2.)[10]

Nor, in my view, is it fatal that individual members of the industries Pavlovich targeted are not based *exclusively* within California. When, as here, one purposefully directs injurious conduct against entire industries, with *actual knowledge* that they are *primarily or substantially* present in a particular forum, his contacts with that state are no more attenuated, random, or fortuitous, than if, by unusual happenstance, they were solely concentrated there. The actor must reasonably anticipate that litigation generated by his intentional conduct will originate in a forum where, as he knows, the industry or industries he sought to injure are primarily or substantially located. Otherwise, one who acted from a remote location against an entire multistate or multinational industry, as opposed to a single enterprise, could

---

[10]In any event, where minimum contacts are otherwise present, it may not be *necessary* that the "brunt of the harm" was suffered in the forum. In *Keeton, supra,* 465 U.S. 770, the high court allowed a New Hampshire defamation action against a national magazine with circulation in that state, even though the plaintiff was a resident of New York, and it was "undoubtedly true that the bulk of the harm done to [the plaintiff] occurred outside [the forum]." (*Id.* at p. 780 [104 S.Ct. at p. 1481].)

rest secure that he was immune from suit in *every* jurisdiction where members of that industry were located.

Indeed, that is the unfortunate result, and the glaring flaw, of the majority's holding. Under the majority's rule, the California-centered industries directly targeted by Pavlovich and his numerous Internet colleagues have no recourse for their alleged injury but to pursue a multiplicity of individual suits against each defendant in his or her separate domicile. Nothing in the basic principles of long-arm jurisdiction compels such an illogical and unfair outcome. I therefore conclude that Pavlovich purposefully established minimum contacts with California sufficient to permit litigation related to those contacts to proceed against him here.

Of course, "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts [must] be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' [Citations.] Thus courts in 'appropriate case[s]' may evaluate 'the burden on the defendant,' 'the forum [s]tate's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interests of the several [s]tates in furthering fundamental substantive social policies.' [Citations.]" (*Burger King, supra,* 471 U.S. 462, 476-477 [105 S.Ct. 2174, 2184]; see also *Asahi Metal Industry Co., supra,* 480 U.S. 102, 113 [107 S.Ct. 1026, 1032-1033]; *World-Wide Volkswagen, supra,* 444 U.S. 286, 292 [100 S.Ct. 559, 564].)

"These considerations sometimes serve to establish the reasonableness of jurisdiction upon a *lesser showing of minimum contacts* than would otherwise be required. [Citations.]" (*Burger King, supra,* 471 U.S. 462, 477 [105 S.Ct. 2174, 2184], italics added.) Moreover, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable." (*Ibid.,* italics added.)

Though Pavlovich argues otherwise, he has failed to make such a compelling case here. On the contrary, as the Court of Appeal concluded, the factors bearing on the overall reasonableness of California jurisdiction weigh strongly on the side of such jurisdiction.

The first of these factors, the burden on the defendant, favors Pavlovich the most, since he would presumably be required to travel from his current home in Texas to defend the suit. We cannot discount the significant time, expense, and inconvenience this may entail.

But such concerns are present whenever jurisdiction away from the defendant's residence is at issue. Here, the travel required is domestic, not international, and Pavlovich is not disadvantaged by the alien judicial system of a foreign nation. (Compare, e.g., *Asahi Metal Industry Co., supra,* 480 U.S. 102, 114 [107 S.Ct. 1026, 1033]; *Core-Vent, supra,* 11 F.3d 1482, 1489.) The distance between Texas and California is not extreme under modern conditions. Pavlovich cites his youth and represents in his brief that his current income is relatively low, but he does not otherwise suggest any unusual hardship.

Moreover, as indicated above, Pavlovich assumed the DeCSS source code was an illegal infringement of the licensed CSS technology, yet a decision was made to post it on the LiVid Web site anyway. Pavlovich thus had reason to anticipate a responsive lawsuit from somewhere. According to his deposition, he has already voluntarily appeared outside his home state as an expert witness in related litigation. Thus, the burden is not constitutionally unreasonable in this case.

On the other hand, the interests of the plaintiff, the forum, and the interstate judicial system all strongly favor jurisdiction in this state. For several reasons, California is a logical forum for convenient, efficient, and effective relief. The industries affected by Pavlovich's conduct are centered or substantially present here. Their licensing agent DVD CCA, the plaintiff in this suit, has its headquarters here. As indicated above, California has a natural interest, reflected by the reach of its long-arm statute, in redressing the effects of an act within its territory, even though the act was done elsewhere. (See *ante,* p. 286.) California has also evidenced a more specific interest in the type of injury at issue here. California's adoption of the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.) reflects both its common concern with regulating trade secret infringements and its special interest in providing effective remedies for such infringements committed against its own residents.

Finally, and importantly, both DVD CCA and the interstate judicial system have a strong interest in efficient resolution of DVD CCA's dispute, involving common issues of fact and law, with *all* of the many defendants named in its complaint. That interest is not served by requiring DVD CCA to pursue individual defendants in separate fora, if a single suit in one fair and logical forum is possible. For the reasons already stated, California is such a forum in this case. In fact, I submit, California's specific interests, reinforced by the interest in efficient dispute resolution, are so strong here that "the reasonableness of [California] jurisdiction [may be established] upon a lesser showing of minimum contacts than would otherwise be required." (*Burger King, supra,* 471 U.S. 462, 477 [105 S.Ct. 2174, 2184].) For these reasons, I

am amply persuaded that California's assertion of personal jurisdiction over Pavlovich, for purposes of this specific litigation, is constitutionally fair and reasonable.[11]

Though the majority imply otherwise, the result I propose does not signal a broad new rule that California jurisdiction is proper over any foreign defendant who causes foreseeable effects in this state. On the contrary, I base my conclusions on the specific facts of this case. These facts indicate that defendant Pavlovich engaged in intentional conduct purposefully targeted at interests he knew were centered or substantially present in California, with knowledge they would suffer harm here, such that he must reasonably have anticipated being called to account in this state. Pavlovich thus forged minimum contacts with California, and it is otherwise fair and reasonable to assert personal jurisdiction over him here for purposes of related litigation. For these reasons, and these reasons alone, I conclude that his motion to quash was properly denied.

I would affirm the judgment of the Court of Appeal.

George, C. J., and Chin, J., concurred.

---

[11]To the extent it is relevant to consider whether California jurisdiction would conflict with the competing sovereign interest of another forum, particularly the defendant's state of residence (see, e.g., *Core-Vent, supra*, 11 F.3d 1482, 1487), Pavlovich identifies no specific interest of Texas in this litigation that might create such a conflict, and I am aware of none. Pavlovich concedes that this factor has little if any weight in his favor.