Filed 3/21/25  Hernandez v. Akebono Brake Industry Co. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BLANCA HERNANDEZ et al.<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>AKEBONO BRAKE INDUSTRY CO. LTD.,<br><br>        Defendant and Respondent. | A169088<br><br>(Alameda County<br>Super. Ct. No. RG21102984) |

Plaintiffs challenge the trial court's order granting defendant Akebono Brake Industry Co., Ltd.'s (ABIC) motion to quash service of the summons for lack of personal jurisdiction.  Plaintiffs argue that ABIC's contacts with California are sufficient to support the trial court's exercise of specific personal jurisdiction, their claims relate to these contacts, and ABIC fails to show that the exercise of personal jurisdiction over it would be unreasonable. We agree and reverse.

BACKGROUND

Per the operative complaint, plaintiffs are the widow and adult children of the deceased, Raul Hernandez (Hernandez), and plaintiff Blanca Hernandez is his successor-in-interest under Code of Civil Procedure sections 377.11, 377.20, and 377.30.

1

Plaintiffs allege that Hernandez died from mesothelioma, which he developed because of exposure to asbestos over a 40-year career as an automobile mechanic, including exposure to asbestos-containing brakes and clutches from Toyota cars at a Toyota dealership from 1977 to 2009. Plaintiffs allege that these Toyota vehicles incorporated OEM and genuine Toyota replacement parts with asbestos-containing friction components and/or entire parts supplied by ABIC. Plaintiffs assert causes of action for strict products liability, negligence, and fraud against ABIC.

Plaintiffs also allege that Akebono America, Inc. (AAI), Akebono Brake Corporation (ABC)[1], and Akebono International were "alternate entities" of ABIC, and that ABIC was liable for the conduct and defective products of these alternate entities. Plaintiffs named ABC as a defendant.

ABIC specially appeared and filed a motion to quash service of summons (the motion), contending that the trial court did not have personal jurisdiction over it because ABIC did not purposefully avail itself of the California market.

Along with its motion, ABIC submitted evidence that ABIC is headquartered in Japan, and the "primary business of ABIC was (and is) developing and manufacturing automotive brake systems in Japan, including friction material for brakes." ABIC is not registered to do business, and never maintained a principal place of business, in California. ABIC does not have facilities in California, it did not design or manufacture friction materials in California, and it did not sell any friction materials "directly to end users" in California. Further, ABC, AAI, and Akebono International were not and are not alternate entities for ABIC; instead, each was or is a separate corporation and legal entity.

---

[1] AAI was a predecessor company to ABC.

Plaintiffs opposed ABIC's motion, arguing that "ABIC is subject to specific personal jurisdiction here because, from the 1970's through 2000's, ABIC itself and then in conjunction with its newly created subsidiaries supplied ABIC's brakes and clutches to the California market." We summarize the jurisdictional evidence that plaintiffs submitted chronologically as follows:

1977. Plaintiffs submitted a June 1, 1977 letter from ABIC's President Nobumoto to the Friction Materials Standards Institute (FMSI) in New Jersey announcing the establishment of Akebono International, ABIC's wholly owned subsidiary. ABIC wrote that Akebono International had "just taken over all affairs related to the overseas trade of our products," and requested that the FMSI render Akebono International the same cooperative consideration that it had given to ABIC for "many years." Attached to the letter was an "Announcement of Establishing New Company," listing information about Akebono International and listing its business activities as "[d]irect, indirect, and other related business concerning overseas trade of various brakes, their component parts, friction materials, and special metallic materials manufactured and marketed by [ABIC] and all types of automobile parts, equipment, and devices."

Plaintiffs produced a translated Japanese corporate information statement for Akebono International that reflected its 1977 incorporation. This document listed Akebono International's head office at the same address as ABIC's office in Japan. One of Akebono International's listed purposes was "[d]irect and indirect operations related to the import and export of various brake devices, their components, friction materials, special metal materials, and other various automobile parts, appliances, devices."

3

1980.  ABIC's annual reports stated that ABIC established its "North American operations" by starting AAI, its "sales and marketing arm" in 1980. Plaintiffs submitted the deposition testimony of ABC's corporate representative, Brandon Kessinger, who testified in another case that AAI was a wholly-owned subsidiary of ABIC incorporated on March 31, 1980. Kessinger testified that ABIC sought to market and sell its brake products in the United States in the 1980s, and forming AAI was one of the methods of doing so.  Kessinger did not believe that AAI ever directly sold product in the United States; instead, he believed that Akebono International did so with AAI assisting in some form.  Kessinger testified that ABIC sent people overseas and "the charge that those people had [was] to try to find a market for ABIC's product."

1977 to 1982.  Plaintiffs submitted translated versions of AAI business reports from 1980, 1981, and 1982 that ABIC produced in another litigation and stipulated were authentic.  The 1980 and 1982 reports indicate distribution to "President Nobumoto."  Among other things, these documents reflect sales of ABIC friction products to two customers, Daido and European Parts Exchange (EPE), with sales to Daido from 1977 through 1981, and sales to EPE from 1978 through 1981.  The documents also show AAI's goal of increasing sales to these entities in 1982.

The reports show EPE in Irvine, California, and reflect that AAI was to visit the Irvine office in November 1980.  Kessigner confirmed that EPE was located in California and that ABIC products were sold to EPE in the early 1980s.  Plaintiffs' evidence describes EPE as a "rebuilder," including of "genuine Toyota clutches" along with brake shoes, clutches, water pumps, engine heads, and calipers.  The reports also show that a rebuilder's supply chain is either sale to (1) "Local W/D," to "Jobber," to "Garage, Service

4

Station, Car Dealer, Etc.," to "Car Owner;" or (2) "Jobber," to "Garage, Service Station, Car Dealer, Etc.," to "Car Owner."

The 1981 and 1982 reports show Daido in Los Angeles, California, and sales of ABIC products to Daido from 1977 through 1981. Daido is depicted as conducting "indirect" trade of ABIC products by accepting the products F.O.B. Japan, shipping them across the Pacific Ocean, and then selling them to import & warehouse distributors, who in turn sell to rebuilders, who in turn sell down a product chain as discussed above.

The 1982 business report also reflects discussions of a proposed joint venture between EPE, potentially Mitsubishi, and an Akebono proposed entity, "ARC," to pursue "Japanese vehicle OES business" and a " 'Rebuild Factory.' " Meetings occurred in the EPE office, and, in conjunction with these discussions, the report lists "how to handle the Unitary Tax in California" as an item for future consideration.

1988 to 1989. Akebono International's Japanese corporate information statement reflected that the company was dissolved between 1988 and 1989. ABIC's 1989 Annual Report stated the "entire business operations" of Akebono International were transferred to ABIC in July 1989. ABIC shareholder meeting minutes from 1988 stated that Akebono International's main business activities were "[i]mport/export and wholesale of automotive parts." They also stated, "When Akebono Brake International was established in 1977, the company's objective was to promote exports with the aim of achieving independent profitability at export prices. Today, the situation has changed drastically with the appreciation of the yen, intensifying trade friction, and the entry of car manufacturers into the U.S. market, and the need for centralized direction and management of domestic

5

and overseas sales policies has made it necessary for the company to cease to be a specialized export trading company."

1990 through 2010s.  ABIC's Annual Reports from 1998, 1999, 2000, 2002, and 2003 referred to a successful business in the United States.  ABIC's Annual Reports from 2009, and from 2012 through 2018, described efforts to develop copper-free brake products and then efforts to transition to copper-free brakes because of laws in Washington and California that would impose a limit on copper use in the future.  These reports also discussed a California registration requirement, effective in 2014, for manufacturers to label and register their brake pads and linings, and plaintiffs produced testimony from Kessinger that ABC obtained this registration for ABIC products as well as ABC products.

After an initial hearing on the motion, the trial court overruled ABIC's objections to plaintiffs' evidence, but found the evidence "too ambiguous to establish ABIC's purposeful availment of the California market with respect to ABIC's automotive brake and clutch friction materials during the relevant 1977 to 2009 period."  However, the court continued the hearing to allow plaintiffs to conduct limited jurisdictional discovery, including discovery on their theory that ABIC was a successor in interest and had assumed the liabilities of Akebono International in 1988/1989.

In their supplemental opposition papers, plaintiffs stated that "the fruitful topic" during discovery had been whether ABIC was a successor in interest to Akebono International's activities between 1977 and 1989, and plaintiffs submitted evidence related to that topic.  Plaintiffs requested that the court consider their prior opposition papers, but they did not argue in their supplemental papers that the evidence produced during jurisdictional

6

discovery established that ABIC had purposefully availed itself of the relevant California market.

After a hearing, the court granted ABIC's motion by written order. In its order, the court reviewed plaintiffs' initial opposition papers and made the following observations.

Plaintiffs presented evidence that, on June 1, 1977, ABIC set up Akebono International as a wholly-owned subsidiary, based in Japan and Illinois, for the purpose of marketing and distributing ABIC's friction products outside of Japan, including in the United States. Plaintiffs also presented evidence that ABIC set up another wholly-owned subsidiary, AAI, on March 31, 1980, in Illinois. The court noted that AAI apparently took over from Akebono International the marketing, sales and distribution of ABIC's products in the United States.

The court continued: "[A]s early as 1977, either ABIC or [Akebono] International began selling ABIC-manufactured products to an entity called Daido apparently with the understanding that Daido would be selling and/or distributing ABIC's products in California. Further, as early as 1978, ABIC or [Akebono] International began selling ABIC-manufactured products, including brake shoes, to an entity called [EPE] apparently based in Irvine, California. [Citation.] Plaintiffs present no evidence that either Daido or EPE is or was a California corporation; that the relevant sales of Akebono replacement automotive friction products occurred in California, rather than in Japan or Illinois; or that ABIC or [Akebono] International were responsible for shipping replacement friction products into California to Daido or EPE."

The court rejected plaintiffs' argument that ABIC made the relevant sales, finding the "totality of [p]laintiffs' evidence much more strongly

7

supports a finding that [Akebono] International was the entity contracting with or selling to Daido and EPE." The court then stated that it had "implicitly found that [p]laintiffs' moving evidence was insufficient to prove that this Court has specific personal jurisdiction over ABIC, because [Akebono] International was more likely the entity making direct sales to Daido and EPE prior to 4/1/1980."

The court next found that ABIC was a successor to Akebono International's liabilities, but AAI was the "mere continuation" of Akebono International in the United States, and that AAI – rather than ABIC – assumed any liabilities relevant to this case because "it appears that [AAI] took over all of [Akebono] International's responsibilities with respect to U.S. marketing, distribution and sales on 4/1/1980."[2]

The court concluded, "In sum, [p]laintiffs' evidence is insufficient for the Court to find that ABIC is responsible for [Akebono] International's possible forum contacts from 6/1/1977 to 3/31/1980. Plaintiff bears the burden to prove all facts necessary to establish the Court's personal jurisdiction over ABIC. [Citation.] Further, ABC is a defendant in this action and has not contested this Court's personal jurisdiction over it. Finally, [p]laintiffs have had the opportunity to conduct jurisdictional discovery from both ABIC and ABC but have failed to meet their burden of production."

Plaintiffs timely appealed.

---

[2] The court made this ruling without prejudice, and plaintiffs do not challenge this part of the court's order in this appeal.

8

DISCUSSION

*Standard of Review*

The question of jurisdiction is "in essence, one of law." (*SK Trading Internat. Co., Ltd. v. Superior Court* (2022) 77 Cal.App.5th 378, 387 (*SK Trading*).) When the facts that give rise to jurisdiction conflict, the trial court's factual determinations are reviewed for substantial evidence, but we independently review the legal significance of the facts. (*Ibid.*) Where there is no conflicting evidence, we review the trial court's ruling on personal jurisdiction de novo. (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 273 (*Pavlovich*).)

*Specific Jurisdiction*

California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the United States Constitution. (Code Civ. Proc., § 410.10; *Daimler AG v. Bauman* (2014) 571 U.S. 117, 125.) A California court may exercise personal jurisdiction over a defendant where that defendant has such minimum contacts with the state that the assertion of jurisdiction " 'does not offend traditional notions of fair play and substantial justice.' " (*Ford Motor Company v. Montana Eighth Judicial Dist. Court* (2021) 592 U.S. 351, 357 (*Ford Motor*).) " 'Minimum contacts' may support either general (also called 'all-purpose') jurisdiction or specific (also called 'case-linked') jurisdiction." (*SK Trading, supra,* 77 Cal.App.5th at p. 386; *Ford Motor,* at p. 357.)

Only specific jurisdiction is at issue in this case. "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on "the relationship among the defendant, the forum, and the litigation." ' " (*Walden v. Fiore* (2014) 571 U.S. 277, 283–284.) A court may exercise specific jurisdiction over a nonresident defendant only if: (1) the

9

defendant has purposefully availed himself or herself of forum benefits; (2) the plaintiff's claims are related to or arise out of the defendant's contacts with the forum state; and (3) the forum state's assertion of personal jurisdiction would comport with fair play and substantial justice. (*Pavlovich, supra*, 29 Cal.4th at p. 269; *Ford Motor, supra*, 592 U.S. at p. 359.)

"[The rules governing specific jurisdiction] derive from and reflect two sets of values—treating defendants fairly and protecting 'interstate federalism.' [Citation.] Our [jurisprudence] founded specific jurisdiction on an idea of reciprocity between a defendant and a State: When (but only when) a company 'exercises the privilege of conducting activities within a state'— thus 'enjoy[ing] the benefits and protection of [its] laws'—the State may hold the company to account for related misconduct. [Citation.] Later decisions have added that our doctrine similarly provides defendants with 'fair warning'—knowledge that 'a particular activity may subject [it] to the jurisdiction of a foreign sovereign.' [Citations.] A defendant can thus "structure [its] primary conduct" to lessen or avoid exposure to a given State's courts. [Citation]. And this Court has considered alongside defendants' interests those of the States in relation to each other. One State's "sovereign power to try" a suit, we have recognized, may prevent "sister States" from exercising their like authority. [Citation.] The law of specific jurisdiction thus seeks to ensure that States with "little legitimate interest" in a suit do not encroach on States more affected by the controversy." (*Ford Motor, supra*, 592 U.S. at p. 360.)

"When a defendant moves to quash service of summons for lack of personal jurisdiction, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction. [Citations.] To meet this burden for specific jurisdiction, the plaintiff must establish the purposeful availment

and relatedness requirements by a preponderance of the evidence. [Citations.] If the plaintiff meets their initial burden, then the burden shifts to the defendant to present a compelling case that the exercise of jurisdiction would be unreasonable because it fails to comport with ' " ' traditional notions of fair play and substantial justice. ' " ' " (*L.W. v. Audi AG* (2025) 108 Cal.App.5th 95, 108 (*Audi AG*).)

*Purposeful Availment*

1. Applicable Law

" 'The purposeful availment inquiry . . . focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on' his contacts with the forum. [Citation.] Thus, the ' "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts [citations], or of the "unilateral activity of another party or a third person." [Citation.]' [Citation.]" 'When a [defendant] "purposefully avails itself of the privilege of conducting activities within the forum State," [citation], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.' " (*Pavlovich, supra,* 29 Cal.4th at p. 269.) Our Supreme Court has recognized that a foreign manufacturer purposefully avails itself of California when it takes actions "designed to consummate a business arrangement in which [it] would profit financially by selling its product for use in California," and both knows and intends that its

11

product will "enter California and . . . be used" in this state. (*Secrest Machine Corp. v. Superior Court* (1983) 33 Cal.3d 664, 671.)

In this case, plaintiffs rely on a stream-of-commerce theory of personal jurisdiction, which stems from *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286 (*Woodson*).[3] There, the plaintiffs brought a products liability suit in Oklahoma after getting into an accident there with a car they bought in New York. (*Id.* at p. 288.) They sued the car's manufacturer (Audi), national importer (VWoA), and two New York-based entities, a local distributor and retail dealer. (*Ibid.*) The high court held that Oklahoma could not exercise personal jurisdiction over the dealer and retailer because they had no connection to Oklahoma and jurisdiction could not be based only on the plaintiffs' foreseeable act of driving the car to Oklahoma. (*Id.* at pp. 287, 291.) The court contrasted a scenario that would give rise to personal jurisdiction over Audi and VWoA : "[I]f the sale of a product of a manufacturer or distributor such as Audi or [VWoA] is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." (*Id.* at p. 297.) While "technically 'dicta[,]' " the high court has repeatedly endorsed this conclusion and has described the "Audi/Volkswagen scenario as a paradigm case" of specific jurisdiction. (*Ford Motor*, *supra*, 592 U.S. at p. 364; see also *id.* at p. 363.)

---

[3] At oral argument, ABIC took the position that plaintiffs had not relied on a stream-of-commerce theory below because they did not use the term "stream-of-commerce." Plaintiffs may not have used that precise term, but their briefing below and on appeal relies on this theory and cites relevant authorities.

"Since [*Woodson*] established the stream-of-commerce theory of personal jurisdiction, United States Supreme Court justices have provided competing versions of the scope of the theory in plurality decisions." (*Audi AG, supra*, 108 Cal.App.5th at p. 109.) In *Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102 (*Asahi*), the California plaintiff injured in a motorcycle accident filed a products liability action against the Taiwanese manufacturer of the tire valves for the motorcycle's tire tubes. (*Id.* at pp. 105–106.) Writing for a four-member plurality, Justice O'Connor observed that some courts after *Woodson* had exercised personal jurisdiction based on no more than a defendant's act of placing product in the stream of commerce, while others had required an act more purposefully directed at the forum State — "something more." (*Id.* at pp. 110–111 (plur. opn. of O'Connor, J.).) The plurality found that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." (*Id.* at p. 112.) Justice O'Connor proposed acts that could constitute something more, such as "designing the project for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." (*Id.* at pp. 111–112.)

Justice Brennan's four-member concurrence saw "no need" for the plurality's " '[a]dditional conduct' " requirement: "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is

13

no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State." (*Asahi*, *supra*, 480 U.S. at p. 117 (conc. opn. of Brennan, J.).)

The high court produced another divided decision in a stream-of-commerce case in *J. McIntyre Machinery, Ltd. v. Nicastro* (2011) 564 U.S. 873 (*J. McIntyre*), where the plaintiff was injured by a machine manufactured in England and sold by a distributor to the plaintiff's employer in New Jersey. (*Id.* at p. 878.) The jurisdictional claim centered on the following facts: The manufacturer permitted an independent Ohio-based distributor to sell its machines in the United States; the manufacturer attended annual conventions with the distributor in some States, but none in New Jersey; one machine ended up in New Jersey; the manufacturer held a United States patent; and the distributor structured its advertising and sales efforts in accordance with the manufacturer's " 'direction and guidance whenever possible' " and may have sold some machines on consignment. (*Id.* at pp. 878–879, 888, 896.)

Justice Kennedy, joined by three justices, rejected Justice Brennan's concurrence in *Asahi* and endorsed Justice O'Connor's stream-of-commerce plus approach. (*J. McIntyre*, *supra*, 564 U.S. at pp. 883–885 (plur. opn. of Kennedy, J.).) Justice Kennedy then found that the "[manufacturer] directed marketing and sales efforts at the United States," but the exercise of jurisdiction was improper because the facts revealed at most "an intent to

14

serve the U.S. market, but . . . not . . . that [the manufacturer] purposefully availed itself of the New Jersey market." (*Ibid.*)

Justice Breyer's controlling concurrence (joined by Justice Alito) provided the narrowest grounds for the decision. (*Marks v. United States* (1977) 430 U.S. 188, 193 [when an opinion does not command a majority, the controlling holding is the position of the judges who concurred on the narrowest grounds].) Justice Breyer found that precedent determined the case's outcome. (*J. McIntyre*, *supra*, 564 U.S. at p. 887 (conc. opn. of Breyer, J.).) Emphasizing the single New Jersey sale, Justice Breyer recognized that precedent "strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." (*Id.* at p. 888.) He concluded that "the relevant facts found by the New Jersey Supreme Court show no 'regular . . . flow' or 'regular course' of sales in New Jersey; and there is no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else." (*Id.* at p. 889.) "In the context of this case," Justice Breyer could not agree with the "absolute approach" that "a producer is subject to jurisdiction for a products-liability action so long as it 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.' " (*Id.* at pp. 890–891.)

After *J. McIntyre*, California courts have recognized that merely placing a product into the stream of commerce is not a sufficient basis to exercise personal jurisdiction over a nonresident. (*Bombardier Recreational Products, Inc. v. Dow Chemical Canada ULC* (2013) 216 Cal.App.4th 591, 602; *Dow Chemical Canada ULC v. Superior Court* (2011) 202 Cal.App.4th

15

170, 179.)  However, most recently in *Audi AG*, our colleagues in the Third District held that a California court could exercise personal jurisdiction over a foreign car manufacturer who indirectly served the forum through an exclusive distributor that imported, marketed, and regularly sold the manufacturer's cars in California under the above-discussed stream-of-commerce jurisprudence.  (*Audi AG*, *supra*, 108 Cal.App.5th at pp. 108–119 [jurisdiction could be exercised where manufacturer marketed its product through a distributor who agreed to serve as sales agent in United States, including California, and there was regular flow of product into California].)

    2.  Analysis

    Plaintiffs' theory of purposeful availment is that ABIC manufactured brakes and clutches and used its subsidiaries, Akebono International and AAI, to sell those products into the California market.  We address the following alleged jurisdictional contacts relied upon by plaintiffs to support their claim: (1) the sale of ABIC products in the United States prior to June 1, 1977; (2) the sale, either by Akebono International or AAI, of ABIC products to customers EPE and Daido; (3) discussions of a joint venture with EPE for a " 'Rebuild Factory' " in the early 1980s; (4) the dissolution of Akebono International in 1988/1989; and (5) ABIC Annual Reports discussing the consolidated business of ABIC and affiliated companies in the United States, the transition of ABIC and its subsidiaries to "copper-free replacement brakes during the 2010s" because of Washington and California laws, and ABIC's registration of its brake pads and linings in California in 2014.

    Much of plaintiffs' evidence fails to establish a connection to California. The FMSI letter, which plaintiffs contend provides evidence of ABIC product sales in the United States before to June 1, 1977, does not establish sales in

California. The same is true for plaintiffs' evidence regarding ABIC's assumption of Akebono International's business, as well as the ABIC Annual Reports from 1998, 2000, 2002, and 2003 that discuss the "United States" or "North America" as a whole. This evidence does not show purposeful availment of the *California* market.

We reach the opposite conclusion with respect to sales of ABIC products to EPE and Daido. It is undisputed that ABIC sought to sell its product in the United States in the early 1980s. ABIC set up Akebono International on June 1, 1977, as a wholly-owned subsidiary for the purpose of marketing and distributing ABIC's products outside of Japan, including in the United States. ABIC then set up AAI, an Illinois wholly-owned subsidiary, on March 31, 1980, to be the "sales and marketing arm" for ABIC products in the U.S. Plaintiffs' uncontradicted evidence shows that EPE was based in California and shows a regular course of sales of brake and clutch materials to EPE from 1978 to 1981, with EPE's business constituting 1%, 5%, and 19% of U.S. total revenue in 1978, 1979, and 1980, respectively. Uncontradicted evidence from AAI's 1981 and 1982 business reports reflects Daido in Los Angeles, California, and sales of ABIC brake and clutch products to Daido from 1977 through 1981, with 11%, 50%, 71%, and 68% of U.S. total revenue in 1977, 1978, 1979, and 1980, respectively. Based on these contacts, ABIC purposefully availed itself of California by intentionally placing its products into the regular flow of commerce to the United States, including to California, through Akebono International and AAI.[4] (See *Asahi, supra*, 480

---

[4] ABIC argues that we should review this matter under a variation of the substantial evidence standard used when the trial court concludes that a party failed to meet his or her burden of proof. In its final order, the trial court found a lack of purposeful availment on ABIC's part because Akebono International, not ABIC, made the sales to EPE and Daido from 1977 to

17

U.S. at pp. 112–113 (plur. opn. of O'Connor, J.) [marketing product through a distributor who agreed to serve as sales agent in forum is sufficient "additional conduct"]; *id.*, at p. 117 (conc. opn. of Brennan, J.) [jurisdiction lies where a sale is part of "the regular and anticipated flow" of commerce in forum]; *J. McIntyre, supra*, 564 U.S. at p. 889 (conc. opn. of Breyer, J.) [jurisdiction lies where there is a regular course of in-forum sales and/or some additional efforts directed toward the forum]; see also *Woodson, supra*, 444 U.S. at p. 297; *Audi AG, supra*, 108 Cal.App.5th at p. 111.)

Finally, regarding plaintiffs' evidence pertaining to discussions with EPE to form a joint venture in the early 1980s and evidence pertaining to "the 2010s," we need not decide the question of purposeful availment because, even if we assume that the transition to copper-free brakes "in the 2010s" and the registration of ABIC brake materials in California in 2014 constitute relevant California contacts for ABIC, plaintiffs fail to establish the second prong of the specific jurisdiction analysis with respect to these contacts, as discussed below.

*Relatedness*

1. Applicable Law

The second prong of the minimum contacts test requires some connection between the plaintiff's claims and the defendant's forum activities. "The plaintiff's claims . . . 'must *arise out of or relate to* the defendant's contacts' with the forum [Citations]. Or put just a bit differently, 'there must

---

March 1, 1980 (rejecting a stream-of-commerce theory). We review de novo whether uncontradicted facts establish purposeful availment under a stream-of-commerce theory. ABIC also contends plaintiffs' evidence was inadmissible; however, the trial court overruled ABIC's objections below for procedural reasons, and ABIC does not argue or show on appeal that the court erred in doing so.

18

be " an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." ' " (*Ford Motor*, *supra*, 592 U.S. at pp. 359–360, italics added.)

*Ford Motor*, the United States Supreme Court's most recent discussion of the second prong of the specific jurisdiction analysis, involved two product liability lawsuits against Ford where the injury-causing accidents occurred in the state where the plaintiffs resided, Montana and Minnesota, respectively, but in each case the allegedly defective vehicles the plaintiffs had driven were sold, designed, and manufactured in another state. (*Ford Motor*, *supra*, 592 U.S. at pp. 356–357.) Ford conceded that it did substantial business in Montana and Minnesota by advertising, selling, and servicing the same vehicle models that the plaintiffs alleged injured them. (*Id.* at pp. 354–355.) However, in each case, Ford argued that the plaintiff's claims did not arise out of or relate to Ford's contacts with the forum State because Ford did not sell, manufacture or design the car that injured the plaintiff in the forum State. (*Id.* at p. 361.) The court rejected Ford's "causation-only" argument. (*Ford Motor*, *supra*, 592 U.S. at p. 361.) "The first half of [the 'arise out of or relate to'] standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing. That does not mean anything goes. In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." (*Id.* at p. 362.)

The court then explained why Ford's forum connections related to the plaintiffs' claims. "Each plaintiff's suit, of course, arises from a car accident in one of those [forum] States. In each complaint, the resident-plaintiff alleges that a defective Ford vehicle . . . caused the crash and resulting harm.

19

And as just described, Ford had advertised, sold, and serviced those two car models in both [forum] States for many years. (Contrast a case, which we do not address, in which Ford marketed the models in only a different State or region.) In other words, Ford had systematically served a market in [the forum states] for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States. So there is a strong 'relationship among the defendant, the forum, and the litigation'—the 'essential foundation' of specific jurisdiction." (*Ford Motor, supra*, 592 U.S. at p. 365.) The court also explained that, given Ford's extensive in-forum business, Ford had an obligation to provide products that were safe for citizens to use in the forum States, and Ford had fair notice that its in-forum conduct could give rise to product liability suits if the vehicle models at issue malfunctioned in the forum States. (*Id.* at pp. 364–368.)

2. Analysis

We must determine whether plaintiffs' claims " 'arise out of *or relate to'* " to ABIC's California contacts. (*Ford Motor*, *supra*, 592 U.S. at p. 362.) To reiterate, the contacts we consider here are: (1) the sales of ABIC products to EPE and Daido; (2) discussions with EPE regarding a joint venture and rebuild factory; (3) the development and transition to "copper-free" brakes during the 2010s by ABIC and its subsidiaries because of Washington and California laws; and (4) and the registration of ABIC brake materials in California showing compliance with substance content restrictions for brake materials starting in 2014.

Turning first to the sales to EPE and Daido, Plaintiffs contend that these sales " 'arise from or relate to' " to their lawsuit because ABIC purposefully supplied its friction products to EPE and Daido, and Hernandez

was allegedly injured by ABIC friction products in California. We agree that these sales are sufficiently related to plaintiffs' claims.

ABIC sold its friction products, including brake and clutch products, through its subsidiaries from 1978 through 1981 to EPE in California, and the evidence also shows sales in 1980 and 1981 to Daido in Los Angeles, California. As ABIC was undisputedly aware, the products sold were intended for use and installation in consumer vehicles. And Hernandez alleged he was injured by ABIC brake and clutch friction products in California. ABIC does not meaningfully dispute this, apparently contending that the relatedness prong is not met with respect to ABIC brake products sold after 2000, which did not contain asbestos. (*Ford Motor*, *supra*, 592 U.S. at p. 365 [finding relatedness prong satisfied because plaintiffs alleged in-forum injury from same model vehicle that Ford advertised, sold, and serviced in the forum].) Because due process does not require a causal showing (*id.*, at p. 362) and ABIC had fair notice that it could be sued in California for the consequences of defects relating to its product (*id.* at p. 386), plaintiffs' product liability claims sufficiently relate to these California contacts.

The same is not true for discussions with EPE with respect to a joint venture and rebuild factory in the 1980s, ABIC's transition to copper-free brakes, or the California registration of ABIC brake products in 2014. Regarding the EPE joint venture discussions, the record contains no evidence that a joint venture was actually formed, or, if it was, where it operated or what it did. Plaintiffs accordingly have not shown that this alleged forum contact sufficiently relates to their claims.

Similarly, plaintiffs fail to show their claims relate to ABIC's development of copper-free brake products "during the 2010s" and its

21

registration of its brake products in California in 2014.  ABIC's Annual Reports from 2009, 2012, 2013, 2014, 2015, 2016, 2017, and 2018 discuss efforts of the "Company" and AEC, the research arm of ABC (which made its own brake product in the United States) to develop copper-free brakes, citing California and Washington laws effective in 2021 that would regulate the copper content of new brake products.  These reports state that "Akebono" began "marketing" copper-free aftermarket products in 2007 and continued the development of these materials through 2014, when it started the "mass production" of copper-free rear brake materials and began supplying OEM customers.  Starting in 2014, ABIC also registered its brakes in California to comply with regulations on the use of copper and other substances in new brake materials.  But plaintiffs' evidence does not show any sale of ABIC's copper-free products in California during the period of Hernandez's alleged exposure (1977 to 2009).  They hence have not proven that these contacts sufficiently relate to the claims in this case.  (Cf. *Ford Motor*, *supra*, 592 U.S. at p. 365.)

*Fair Play and Substantial Justice*

ABIC has not carried its burden to show that the exercise of jurisdiction over it would be unreasonable (*Audi AG*, *supra*, 108 Cal.App.5th at p. 118), opting instead to argue in this appeal that this prong of the jurisdictional analysis is irrelevant because plaintiffs failed to establish the first two elements of the specific jurisdiction test.  Given ABIC's efforts to serve the California market indirectly through Akebono International and AAI, it should have reasonably anticipated being required to defend those activities in a California court.

DISPOSITION

The judgment is reversed.

22

_____
BROWN, P. J.


WE CONCUR:


_____
GOLDMAN, J.




_____
SIMONDS, J.*




A169088/*Hernandez v. Akebono Brake Industry Co.*


---

* Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.